De Gray v. Monmouth Beach Club House Co.

RICHARD DE GRAY

v.

THE MONMOUTH BEACH CLUB HOUSE COMPANY et al.

1. A covenant, restrictive of the use of land, will be enforced in equity against subsequent purchasers with notice, if it is not against public policy.

2. The right of the owner of a lot to enforce a covenant restrictive of the use of another tract, entered into between former owners, depends primarily on the covenant having been made for the benefit of the land embracing said lot.

3. Where there is a general scheme or plan, adopted and made public by the owner of a tract, for the development and improvement of the property, by which it is divided into streets, avenues and lots, and contemplating a restriction as to the uses to which buildings or lots may be put, to be secured by a covenant embodying the restriction, to be inserted in each deed to a purchaser; and it appears, by writings or by the circumstances, that such covenants are intended for the benefit of all the lands, and that each purchaser is to be subject to and to have the benefit thereof; and the covenants are actually inserted in all deeds for lots sold in pursuance of the plan; one purchaser and his assigns may enforce the covenant against any other purchaser and his assigns, if he has bought with knowledge of the scheme and the covenant has been part of the subject-matter of his purchase.

4. In construing a covenant, entered into in pursuance of such a general plan or scheme, the objects and purposes had in view by the original promoters are to be taken into consideration.

On bill, answers and proofs in open court.

*Mr. Wilbur A. Heisley* and *Mr. R. Wayne Parker,* for the complainant.

*Mr. Edward Q. Keasbey* and *Mr. Anthony Q. Keasbey,* for the defendants.

GREEN, V. C.

The title of the lands known as the Monmouth Beach property, purchased by a number of individuals, was vested in two

of their number as joint tenants, who held the title in trust for the owners.

By deed dated October 2d, 1871, acknowledged October 11th, 1871, Daniel Dodd and Francis Mackin, the then trustees, conveyed to Richard De Gray lot No. 20, as laid down on the map of the Monmouth Beach property made by K. Fosburgh in September, 1871, said lot being one hundred feet front and rear, and about four hundred and fifty feet deep, running from the east side of Ocean avenue to the Atlantic ocean, and being the southeasterly corner of Ocean avenue and Beach road.

Beach road is laid out on the map as running from the club-house property, hereafter mentioned, to the ocean.

The deed contains the following covenant:

"And the said party of the second part, for himself, his heirs and assigns, doth hereby covenant to and with the said Daniel Dodd and Francis Mackin, their heirs, executors and administrators, that he the said party of the second part, his heirs or assigns, will not at any time hereafter erect or permit upon any part of the said lot any hotel, drinking saloon, gaming house, slaughterhouse, furnace, manufactory, brewery, distillery, or building for the curing of fish, or for any other uses or purposes that shall depreciate the value of the neighboring property for dwelling houses."

The deed was recorded in Monmouth county clerk's office October 18th, 1871.

By deed also dated October 2d, 1871, and acknowledged October 11th, Daniel Dodd and Francis Mackin, the then trustees, conveyed to Benjamin F. Robinson lot No. 22, as laid down on said map, being one hundred feet front and rear, running from the east side of Ocean avenue to the Atlantic ocean, and being the northeasterly corner of Ocean avenue and Beach road.

This deed contained the same covenant as the former, and was recorded September 11th, 1872.

This lot was conveyed by deed dated September 2d, 1879, by Benjamin F. Robinson and wife to Sarah Seymour Houghton, wife of Matthew H. Houghton, and was therein declared to be conveyed "subject to all the conditions contained in said deed from Dodd and Mackin to the said Robinson."

De Gray v. Monmouth Beach Club House Co.

By deed dated October 17th, 1871, and recorded November 3d, 1871, the same trustees conveyed lot No. 24, subject to the same covenant, to Jacob S. Wetmore. The title to this lot, by various *mesne* conveyances, all recorded in Monmouth county clerk's office, passed to one Samuel Blagden, by whom it was conveyed to the said Richard De Gray by deed dated October 24th, 1879. Each of these deeds, except that from George W. Brown, sheriff, to Blagden, and that from Blagden to complainant, contained the covenant.

October 25th, 1876, Daniel Dodd and Anthony Q. Keasbey, the then trustees, conveyed to Richard De Gray lot No. 26, running from Ocean avenue to the Atlantic ocean, and lying north of and adjoining lot No. 24. The deed thereof contained the same covenant, and was acknowledged October 27th and recorded October 31st, 1876.

It thus appears that the complainant is the owner of lot No. 20, separated by the Beach road from defendants' lot No. 22, called the Robinson lot, both lots having been conveyed by the trustees on the same day, viz., October 2d, 1871; that he is also the owner of lot No. 24, adjoining the Robinson lot on the north, and also of lot No. 26, the next lot thereto; all of which were conveyed by the trustees subject to the same covenant.

The complainant has a grant from the state of the riparian rights in front of his property, including the one-half of the Beach road lying adjacent to lot No. 20.

By deed dated December 3d, 1878, Edward A. Walton and Samuel Dodd, the then trustees, conveyed to Sarah S. Houghton, wife of Matthew H. Houghton, four tracts of land, part of the Monmouth Beach property, the first being a circular-shaped lot, on which stands the club-house, known as "Sea View Cottage plot," laid out and shown on the said map of the Monmouth Beach property, excepting thereout certain lots which had been theretofore conveyed by the trustees, subject also to a lease to Matthew H. Houghton for the term of five years from January 1st, 1876. The second, third and fourth tracts conveyed were other portions of the Monmouth Beach property. This deed contains the same covenant inserted in the before-mentioned

De Gray v. Monmouth Beach Club House Co.

deeds, followed by this proviso: "But this covenant is not to apply to the club-house mentioned in the tract first above described, and heretofore occupied by Matthew H. Houghton."

Sarah S. Houghton and her husband, by deed dated November 20th, 1890, conveyed to the Monmouth Beach Club House Company, incorporated under the laws of New Jersey, four tracts of land, the first being the club-house tract; the second and third, two other of the tracts conveyed to her by the deed from Walton and Dodd "subject to the covenants and restrictions and with the express reservation and exemption as to 'the club-house' contained in said deed;" the fourth, lot No. 22, conveyed to her by Benjamin F. Robinson and wife, referring specifically to the deed from them, dated September 2d, 1879, and the record thereof, and also conveying the riparian rights conveyed by the state to the parties of the first part of said deed.

The bill as originally filed by Mr. De Gray sought to enforce the covenant contained in these deeds by enjoining the building of a large house upon the club-house tract and the erection of a commodius bathing-house on the Robinson lot.

It is settled that a court of equity will restrain the violation of a covenant, entered into by a grantee, restrictive of the use of lands conveyed, not only against the covenantor but against all subsequent purchasers of the lands with notice of the covenant, irrespective of the questions whether the covenant is of a nature to run with the land or whether it creates an easement; provided, however, that its enforcement is not against public policy. *Tulk* v. *Moxhay*, 2 *Phil.* 774 (said by Brett, L. J., in *Haywood* v. *Brunswick Building Society, 8 Q. B. Div. 403, 407,* to be the leading case on the subject); *Mann* v. *Stephens, 15 Sim. 376; Bristow* v. *Wood, 1 Coll. 480; Coles* v. *Sims, 5 De G., M. & G. 1; Wilson* v. *Hart, L. R. (1 Ch. App.) 468; Fielden* v. *Slater, L. R. (7 Eq. Cas.) 523; Richards* v. *Revitt, 7 Ch. D. 224; Patman* v. *Harland, 17 Ch. D. 359; Brewer* v. *Marshall, 4 C. E. Gr. 537; Winfield* v. *Henning, 6 C. E. Gr. 188; Coudert* v. *Sayre, 1 Dick. Ch. Rep. 386.*

Chief-Justice Beasley, in *Brewer* v. *Marshall, supra* (at *p. 543*), referring to several of the cases, says: "It will be found upon

examination that these decisions proceed upon the principle of
preventing a party having knowledge of the just rights of another
from defeating such rights, and not upon the idea that the en-
gagement enforced created easements or are of a nature to run
with the land."

While Sir George Jessel, M. R., in *London & S. W. Ry. Co.*
v. *Gomm, 20 Ch. D. 562* (at *p. 563*), speaking of *Tulk* v. *Moxhay*,
said : " The doctrine of that case, rightly considered, appears to
be either an extension in equity of the doctrine of *Spencer's Case*
(*1 Sm. Lead. Cas. 145, 5 Coke 16a*) to another line of cases or else
an extension in equity of the doctrine of negative easements;" the
principle as stated by the chief-justice in *Brewer* v. *Marshall* will
be found to be recognized as the governing one, not only in the
cases he refers to, but in others in which the rule has been consid-
ered. *De Mattos* v. *Gibson, 4 De G. & J. 276 ; Piggott* v. *Strat-
ton, 1 De G., F. & J. 33 ; Keates* v. *Lyon, L. R. (4 Ch. App.)
218 ; Richards* v. *Revitt, supra; Spicer* v. *Martin, 14 App. Cas.
12; Mackenzie* v. *Childers, 43 Ch. D. 265 ; Clegg* v. *Hans, 44
Ch. D. 504.*

This rule of equity being an encroachment on the general doc-
trine of the common law that the burden of a covenant does not
run with the land (*Spencer's Case, 1 Sm. Lead. Cas.; Auster-
berry* v. *Corporation of Oldham, 29 Ch. D. 750*), its application
is not to be extended beyond the class of cases in which it has
been heretofore enforced (*Brewer* v. *Marshall, supra,* at *p. 546*),
and is to be confined to negative covenants. *Hayward* v. *Bruns-
wick Building Society, supra; Hall* v. *Ewin, 37 Ch. D. 74;
London & S. W. Ry. Co.* v. *Gomm, supra.*

The equity thus enforced arises from the inference that the
covenant has, to a material extent, entered into the consideration
of the purchase, and that it would be unjust to the original
grantor to permit the covenant to be violated.

Lord Cottenham, in *Tulk* v. *Moxhay, supra* (at *p. 777*), says :
" It is said that, the covenant being one which does not run with
the land, this court cannot enforce it; but the question is, not
whether the covenant runs with the land, but whether a party
shall be permitted to use the land in a manner inconsistent with

the contract entered into by his vendor, and with notice of which he purchased. Of course, the price would be affected by the covenant and nothing could be more inequitable than that the original purchaser should be able to sell the property the next day for a greater price, in consideration of the assignee being allowed to escape from the liability which he had himself undertaken."

Cotton, L. J., in *Hall* v. *Ewin, supra* (at *p. 79*), says: "As I understand *Tulk* v. *Moxhay*, the principle there laid down was, that if a man bought an under-lease, although he was not bound in law by the restrictive covenants of the original lease, yet if he purchased with notice of those covenants, the court of chancery could not allow him to use the land in contravention of the covenants. That is a sound principle. If a man buys land subject to a restrictive covenant, he regulates the price accordingly, and it would be contrary to equity to allow him to use the land in contravention of the restriction."

Is the complainant in a position to enforce the restrictive covenant in defendants' deeds?

He is the grantee of the original owners, so far as lot No. 20 is concerned, by a deed contemporaneous with the deed from the same grantors under which defendants derive title to the Robinson lot, and prior to that under which the original grantors conveyed the club-house property. He is the owner of lot No. 24 and lot No. 26 by or through deeds from the original grantors, made by them subsequent to their conveying the Robinson and prior to their conveying the club-house property.

The deeds contain no similar covenant on the part of the grantors as to the use of the remaining lands, nor a covenant to insert the same covenant in deeds of other portions of the tract, but all deeds from the trustees do in fact contain the covenant, that as to the club-house only being limited in its operation by the proviso above quoted.

There is, of course, no question as to the right of the trustees to enforce the covenant, but can a prior, contemporaneous or subsequent grantee of other lands, held by the trustees, con-

-veyed by them subject to the same covenant, enforce it in his
·own right against the defendants?

The right of the owner of a lot of land to enforce a covenant,
restrictive of the use of another tract, which covenant has been
·entered into by an owner of such other tract with the former
·owner of both, but has not been expressly assigned, depends
primarily on the covenant having been made for the benefit of
land embracing said lot.   If it has been so made the benefit of
the covenant enures to subsequent purchasers of the land.   *Cou-
·dert* v. *Sayre, supra; Mann* v. *Stephens, supra; Western* v.
*McDermott, supra.*

While, under the operation of this rule, a subsequent pur-
·chaser, or his assigns, might enforce the restriction of a common
·covenant against a prior purchaser, or his assigns, it is evident
that it gives no right of action to a prior against a subsequent
purchaser.   Some other reason must exist for that class of cases
which hold that purchasers and their assigns are entitled to
·enforce, between themselves, a restrictive .covenant entered into
by first purchasers with a common vendor, without reference to
priorities of title.   Vice-Chancellor W. Page Wood, in *Child* v.
*Douglass, 2 Jur. (N. S.) 950, 952,* says:   " I have not been able
·to come to a conclusion, perfectly satisfactory to my own mind,
what are the rights of parties, *inter se*, each of whom has
·covenanted with the landlord, but who have not covenanted
with each other, nor taken any covenant from the landlord to
themselves."

The class of cases in which equity has given such relief em-
braces those involving restrictive covenants, entered into with
the original owner, or owners, of a tract, in pursuance of a gen-
·eral plan for the development and improvement of the property,
by laying it out in streets, avenues and lots, adopting some
uniform or settled building scheme, regulating the number, loca-
tion, size or style of houses, or the uses to which the buildings
·or property may be put.   *Whatman* v. *Gibson, 9 Sim. 196;
Coles* v. *Sims, Kay 75; S. C., 5 De G., M. & G. 1; Western* v.
*McDermott, L. R. (1 Eq. Cas.) 499; S. C., 2 Ch. App. 72; Rich-
·ards* v. *Revitt, 7 Ch. D. 224; Nottingham Brick Co.* v. *Butler,*

De Gray v. Monmouth Beach Club House Co.

*15 Q. B. Div. 261; S. C., 16 Q. B. Div. 778; Spicer* v. *Martin, 34 Ch. D. 1; S. C., 14 App. Cas. 12; Collins* v. *Castle, 36 Ch. D. 243; McKenzie* v. *Childers, 43 Ch. D. 265; Parker* v. *Nightingale, 6 Allen 341; 83 Am. Dec. 632; Linzee* v. *Mixer, 101 Mass. 512; Jeffries* v. *Jeffries, 117 Mass. 184; Hamlin* v. *Werner, 144 Mass. 397.*

The action is held not to be maintainable between purchasers not parties to the original covenant, in cases in which—

(1) It does not appear that the covenant was entered into to carry out some general scheme or plan for the improvement or development of the property which the act of defendant disregards in some particular. *Sheppard* v. *Gilmore, 57 L. I. Rep. (N. S.) Ch. 6; Dana* v. *Wentworth, 111 Mass. 291; Beals* v. *Case, 138 Mass. 140.*

(2) It does not appear that the covenant was entered into for the benefit of the land of which complainant has become the owner. *Sharp* v. *Ropes, 110 Mass. 381; Keates* v. *Lyon, L. R. (4 Ch. App.) 418; Jewell* v. *Lee, 14 Allen 145; Renals* v. *Colishaw, 11 Ch. D. 866.*

(3) It appears that the covenant was not entered into for the benefit of subsequent purchasers, but only for the benefit of the original covenantee and his next of kin. *Master* v. *Hansard, 4 Ch. D. 718.* See *Nottingham Brick Co., 15 Q. B. Div. 261; Collins* v. *Castle, 36 Ch. D. 243; Renals* v. *Colishaw, 9 Ch. D. 125.*

(4) It appears that the covenant has not entered into the consideration of the complainant's purchase. *Renals* v. *Colishaw, 7 Ch. D. 224; S. C., 11 Ch. D. 866; Master* v. *Hansard, supra; Keates* v. *Lyon, supra.*

(5) It appears that the original plan has been abandoned without dissent, or the character of the neighborhood has so changed as to defeat the purpose of the covenant, and to thus render its enforcement unreasonable. *Duke of Bedford* v. *Trustees, 2 Myl. & K. 552; Sayers* v. *Collyer, 28 Ch. D. 103; Trustees* v. *Thacher, 87 N. Y. 311; Ammerman* v. *Deane, N. Y. Ct. App. 30 N. E. Rep. 741; Page* v. *Murray, 1 Dick. Ch. Rep. 325;*

*Roper* v. *Williams, Turn. & R. 18 ; Peek* v. *Matthews, L. R. (3 Eq. Cas.) 515.* See *German* v. *Chapman, 7 Ch. D. 271.*

Vice-Chancellor Hall, in *Renals* v. *Colishaw, 9 Ch. D. 125,* says (at *p. 128*) : " The law as to the burden of, and the persons entitled to, the benefits of covenants in conveyances in fee, was certainly not in a satisfactory state; but it is now well settled that the burden of a covenant entered into by a grantee in fee for himself, his heirs and assigns, although not running with the land at law, so as to give a legal remedy against the owner thereof for the time being, is binding upon the owner of it for the time being, in equity, having notice thereof. Who, then, other than the original covenantee, is entitled to the benefit of the covenant. From the cases of *Mann* v. *Stephens, 15 Sim. 377 ; Western* v. *McDermott, L. R. Ch. 72,* and *Coles* v. *Sims, 5 De G., M. & G. 1,* it may, I think, be considered as determined that any one who has acquired land, being one of several lots laid out for sale as building lots, where the court is satisfied that it was the intention that each one of the several purchasers should be bound by, and should, as against the others, have the benefit of the covenants, entered into by each of the purchasers, is entitled to the benefit of the covenant; and that this right, that is, the benefit of the covenant, enures to the assign of the first purchaser, in other words runs with the lands of such purchaser. This right exists not only where the several parties execute a mutual deed of covenant, but wherever a mutual contract can be sufficiently established."

This opinion is adopted in the same case on appeal. *11 Ch. D. 866,* and approved in *Spicer* v. *Martin, 14 App. Cas. 12.*

In *Nottingham Patent Brick and Tile Co.* v. *Butler, 15 Q. B. Div. 261,* Wills, J. (at *p. 268*), says : " The principle which appears to me to be deducible from the cases is, that where the same vendor, selling to several persons plots of lands—parts of a larger property—exacts from each of them covenants imposing restrictions on the use of the plots, sold, without putting himself under any corresponding obligation, it is a question of fact whether the restrictions are merely matters of agreement between the vendor himself and his vendees, imposed for his own benefit and protec-

tion, or are meant by him and understood by the buyers to be for the common advantage of the several purchasers. If the restrictive covenants are simply for the benefit of the vendor purchasers of other plots of land from the vendor cannot claim to take advantage of them. If they are meant for the common advantage of a set of purchasers, such purchasers and their assigns may enforce them *inter se* for their own benefit."

In the same case on appeal (*16 Q. B. Div. 778*), Lord Esher, M. R. (at *p. 783*), says: "It has been argued that there are no restrictive covenants capable of being enforced in that way (by one purchaser against another) because there was no covenant, either in writing or otherwise in express terms, that each covenantor—each original purchaser—would consider himself bound to the other purchasers, and there-was no covenant by the original vendor. But I think that Wills', J., view of the law on this subject is perfectly correct. In my view, he is right in saying that when an estate is put up for sale in lots, subject to a condition that restrictive covenants are to be entered into by each of the purchasers with the vendor, and the vendor is intending at this sale to sell the whole of the property, the question whether it is intended that each of the purchasers shall be liable in respect of those restrictive covenants, to each of the other purchasers, is a question of fact, to be determined by the intention of the vendor and of the purchasers, and that question must be determined upon the same rule of evidence as every other question of intention. And if it is found that it was the intention that the purchasers should be bound by the covenants, *inter se*, a court of equity will, in favor of one of the purchasers, insist upon the performance of the covenants by any other of them, and will do so under such circumstances without introducing the vendor into the matter."

Much that is said in the opinions of the principle on which equity interferes in this class of cases is open to the criticism of Kekewich, J., in *Collins* v. *Castle, 36 Ch. D. 243*, that the statement of Mr. Justice Wills is really a statement of the law deducible from the cases and scarcely the statement of a principle in a logical sense.

In New York relief seems to be granted on the theory that the covenant creates an easement over the lands of the covenantor for the benefit of all other lands subject to the same covenant. *Trustees* v. *Lynch, 70 N. Y. 440,* and the Massachusetts decisions lean in the same direction. *Beals* v. *Case, 138 Mass. 140.*

While cases involving light, air or view might in some respects be based on the doctrine of easements, it is not satisfactory when it comes to be applied to covenants as to uses to which buildings are to be put, nor could the covenant, if it created an easement, be suspended because a subsequent purchaser did not buy with the restrictions of the covenant in view. But, as stated, the courts in England, as well as our court of errors and appeals, have repudiated the idea that the court interferes on the ground of protecting an easement.

The equity would seem to spring from the presumption that each purchaser has paid an enhanced price for his property, relying on the general plan, by which all the property is to be subjected to the restricted use, being carried out, and that while he is bound by and observes the covenant, it would be inequitable to him to allow any other owner of lands, subject to the same restrictions, to violate it.

Lord Macnaghton, in *Spicer* v. *Martin, 14 App. Cas. 12* (at *p. 25*), says : " It seems to me that when Mr Spicer put his houses in Cromwell Gardens on the market, he invited the public to come in and take a portion of an estate which was bound by one general law, a law perfectly well understood, and one calculated and intended to add to the security of the lessees, and consequently to increase the price of the houses. The benefit of that increase, whatever it was, Mr. Spicer got. Can he or his representative be permitted to destroy the value of the thing he sold, by authorizing the use of part of the estate, for a purpose inconsistent with the law by which he professed to bind the whole."

Justice Wills, in the opinion previously quoted from (*15 Q. B. Div. 269*) says : " Where he (the vendor) retains none (of the property) how can the covenants be for his benefit; and for what purpose can they be proposed except that each purchaser, accepting the benefit of them as against neighbors, may be willing on

that account to pay a higher price for his land than if he bought. at the risk of whatever use his neighbor might choose to put his property to?"

Chief-Justice Bigelow, in *Parker* v. *Nightingale, 6 Allen 341,. 83 Am. Dec. 632* (at *p. 633*), says : "The purposes intended to be accomplished by the restrictions inserted in the deeds of the estate now owned and occupied by the defendant was for the benefit and advantage of other owners of land situated on the same street or court." At *p. 636 :* "By excluding all erections for the purposes of trade, and appropriating each lot to a prescribed use as a dwelling-house, the entire neighborhood comprised within the limits of the orignal tract, laid out for a street or court, was secured against annoyances arising from occupations which would impair the value of the several lots as places of residence." At *p. 637 :* "Thus it entered into the considera- tion which each purchaser paid for his land, either by enhancing. its price in view of the benefit secured to him in the restraint imposed on adjoining owners, or by lessening its value in conse- quence of the limitation affixed to its use."

The law, deducible from these principles and the authorities, applicable to this case, is, that where there is a general scheme or plan, adopted and made public by the owner of a tract, for the development and improvement of the property, by which it is divided into streets, avenues and lots, and contemplating a re- striction as to the uses to which buildings or lots may be put, to be secured by a covenant embodying the restriction, to be inserted in each deed to a purchaser ; and it appears, by writings or by the circumstances, that such covenants are intended for the benefit of all the lands, and that each purchaser is to be subject to and. to have the benefit thereof; and the covenants are actually in- serted. in all deeds for lots sold in pursuance of the plan ; one purchaser and his assigns may enforce the covenant against any other. purchaser and his assigns, if he has bought with knowledge of the scheme, and the covenant has been part of the subject- matter of his purchase.

The right of action from this would seem to be dependent as much on the fact of the general scheme as on the covenant—a

very important consideration in a case in which the question arises whether certain threatened acts are in violation of the covenant, if any ambiguity exists as to its scope and meaning.

The original promoters of the Monmouth Beach scheme purchased a large tract of land some two miles in extent along the ocean, running through to the Shrewsbury river, and comprising some four hundred acres of land. The northerly portion of the track lying between the ocean and the Shrewsbury river is quite narrow, but the southerly end is several hundred yards in width. The tract was purchased with the object of cutting it into tracts for building summer residences, furnishing the owners with the advantages and pleasures incident to the locality. It was, and has continued to be, the intention to dispose of all the property to desirable persons, to maintain the locality as a respectable place of residence during the summer months, and to secure the whole from objectionable features and business.

The owners secured the services of K. Fosburg, an accomplished landscape engineer, and laid out the whole tract in avenues, streets and plots of ground.

The railroad ran so near the ocean as to seriously interfere with the profitable division of their land, and it was therefore moved westerly, and an avenue some four hundred feet from and parallel with the ocean, called Ocean avenue, was laid out practically upon the old location of the railroad.

Streets were laid out upon this map running from Ocean avenue to the ocean at some distance from each another.

Other streets were laid out to the west of the avenue, and the whole property divided into lots of different sizes.

There was an old farm-house upon the tract at the time it was purchased, which was appropriated to the use of the association, and was called the " Club House."

The map, which was very large and elaborate, was hung in a conspicuous place in the club-house.

The title was vested in the two trustees for convenience in making conveyances.

Eminent counsel were employed to draft the form of a deed in which was embodied the covenant in question, and printed blanks

containing it were prepared and used, so far as appears, in all cases. The phraseology of the covenant indicates it is for the benefit of neighboring property. There can be no doubt that each purchaser from the trustees was aware of the plan, and bought with the understanding that all the deeds were to contain the covenant, and bought with that consideration in view.

The trustees had no other interest in the title than as holding it for sale. The case does not admit of the idea that the covenant was only for the advantage or benefit of the grantors, or that it was other than for the benefit of all the lands and each purchaser.

These considerations make the right of the complainant to maintain this action clear.

At the club-house, the gentlemen who were interested in the enterprise found a place for the accommodation of themselves, their families and friends. It was at first operated in the interest of the association, but was afterwards leased to Mr. Houghton, who has, from that time to the present, been identified with its management.

This club-house, from the very commencement, has been from time to time enlarged, to meet the increasing demands upon its facilities, from the large number of those who owned cottages and desired to obtain their meals there, or for the accommodation of the members of the association who did not own houses, or their friends.

The right to the privileges of the club-house, at first, was regulated by card, but afterwards seems to have been entrusted to the good management and judgment of Mr. Houghton, the proprietor, and has been almost entirely confined to the entertainment of the owners of cottages and of their friends.

There are now surrounding the club-house some twenty-nine cottages occupied, the summer residents of which rely upon the club-house to furnish them with their meals, and, the demands of the guests seeming to justify it, a larger building was determined upon, to take the place of the old farm-house, which, with its additions, had been found to be not in keeping with the advanced ideas of the times.

The property on which the club-house stood was purchased with other property, as before stated, by the Houghtons in 1880, from the trustees of the association, and the deed conveying the property purchased contains the covenant with the proviso that this covenant shall not apply to the club-house.

The new building to replace the club-house has been constructed by a corporation formed under the laws of the State of New Jersey, under the name of the "Monmouth Beach Club House Company," being the company to which the property was conveyed by the Houghtons.

One of the objects of the association is stated in its certificate of incorporation to be the erection and maintenance of a hotel upon the property in question.

The company adopted plans of a large and well-arranged building, occupying superficially no more ground than the old club-house and additions, but admirably arranged with regard to the comfort and convenience of guests.

It was claimed that this erection was a violation of the covenant not to erect a hotel, and an order to show cause why an injunction to restrain its construction, with a restraining order in the meanwhile, was originally issued on the presentation of the bill. It, however, being made to appear that the contract had been made, and that the work was well under way, and that serious loss must fall upon some one, and that no injury could happen to the complainant, the restraining order was modified so as to permit the construction and completion of the building.

On the coming in of the answer on the return of the order to show cause, the defendants disclaimed any intention of keeping a house on any other plan than that of the old club-house. The house has been in operation during the past summer, and while its accommodations are more ample and opportunity is at hand for the entertainment of larger numbers, I see nothing in the conduct of the defendants to justify me in saying that their disclaimer has not thus far been kept in good faith, or that their intention is not simply to conduct the building as the old club-house was, and in pursuance of the original scheme under which it was started, except on a more extensive scale, and one com-

mensurate with the increased and increasing demands made upon its accommodations.

This being the case, it seems unnecessary to consider the question as to whether the proviso in the covenant of the deed to the Houghtons, does not expressly except the tract of ground on which this building stands, from the operation of the restriction which prohibited the erection and maintenance of a hotel.

The building is undoubtedly adapted to hotel or club-house use. It could be used as a hotel in its popular sense, but it has during the last summer been used strictly in accordance with the design of the club-house of the Monmouth Beach Association, and that is clearly no violation of the covenant.

The more serious question in the case is with reference to the use of the lot upon the seashore, known as the "Robinson lot," adjoining lands of the complainant.

The original bill charged that it was the intention of the defendants to put up and use on this lot a large building of a character, now known at watering places as a casino, to be constructed so that one floor could be used for a large number of bathing-rooms, the second as an observatory, with piazza and arrangements for the entertainment of persons, as well as for the accommodation of a band to discourse music for the enjoyment of the people who might be led there for the purpose of bathing or pleasure, and charged that this use was in violation of the provisions of the covenant, and would seriously diminish the value of the adjoining property of the complainant.

The answer denied any final determination as to the character of the bathing-house to be erected upon this lot, but averred that from the very commencement of the scheme the lot had been used as a bathing ground by the guests of the club-house, and by the cottagers whose property did not front upon the ocean.

There was, however, presented on the argument of the order to show cause, plans which it appeared had been prepared at the instance of some of the defendants, and which seemed to bear out to a certain extent the allegations of the bill, and it appearing by the affidavits that such a structure would materially depreciate the value of the neighboring property, an injunction was ordered

restraining the building of a bathing pavilion, casino or structure
of that nature on the Robinson lot.

During the progress of the hearing, in the summer, it appeared
that a number of ordinary bath-houses had been put up on this
lot upon the edge of the bluff for the accommodation of the
club-house guests and were being so used. These houses appear
to have been forty-eight in number, arranged in two rows, and
built of rough boards, unpainted and certainly not sightly in
appearance.

An amendment was thereupon made to the bill seeking an in-
junction to restrain the use of this lot by the defendants with
these old bath-houses, or any buildings for affording bathing
facilities of any kind, except such bath-house or room as may be
required by the inmates of any dwelling-house that may be built
on said lot and as a convenience thereto.

The erection of these bath-houses was claimed to be a viola-
tion of the injunction, and complainant asked, by petition, that
their use be enjoined, and the defendants be punished for con-
tempt, and an order was made requiring defendants to show
cause, on the hearing of the case, why such prayer should not be
granted.

The original answer had averred a use, for a number of years,
of the lot in question for bathing purposes by the guests of the
club-house and by the owners of inland cottages. The supple-
mental answer averred that a bathing pavilion was erected at the
end of Beach road by the original promoters of the scheme in
the summer of 1871, when the club-house was first opened, and
before complainant's purchase of lot No. 20, and was used by
the visitors at the club-house and the occupants of cottages, who
had no bath-houses of their own, during every summer from
1871 until Mrs. Houghton bought the Robinson lot (1879), when
it was removed, and bath-houses were put up on the lot instead;
that these bath-houses were put up every summer since that time,
for the use of the guests of the club-house and the cottages, and
had been so used until the present, the same being taken down in
the winter.

De Gray v. Monmouth Beach Club House Co.

The position taken by the defendants as to the original bathing-house, and the subsequent use of the Robinson lot for bathing purposes, was substantially proved by the evidence.

It is insisted on the part of the complainant, that the erection by the defendants of a house or houses on the Robinson lot, and the use thereof, for bathing purposes, by a large number, which must be expected if the privilege is permitted to the club-house and the inshore cottages, or in any way except as an adjunct to a dwelling erected on the lot, is a use or purpose which comes within the restriction of the covenant.

On the part of the defendants, it is claimed that the restriction is of the purposes for which the lot is used, and that bathing was not intended to be interdicted; that the object of this settlement was not only social intercourse, but the enjoyment of the advantages of scenery and of bathing, which the sea afforded, and that therefore it could not be held that the use of a lot for sea-bathing is a purpose which was contemplated by the original parties as within the restriction of the covenant.

The covenant is, that the owner for the time being will not at any time erect or permit upon any part of the said land any hotel, drinking saloon, gaming-house, slaughter-house, furnace, manufactory, brewery, distillery or building for the curing of fish, or for any other uses or purposes that shall depreciate the value of the neighboring property for dwelling-houses.

I do not think the inhibition of particular kinds of business which, with the possible exception of a hotel, may be classified as tending to impair health or comfort, or to be injurious to the morals or peace of the neighborhood, is to be considered as limiting the general provision at the end of the covenant to uses of the character of those specified.

Nor do I think the general clause is to be given a construction that would forbid any use which in any degree might unfavorably affect the value of neighboring property.

In *Schreiber* v. *Creed, 10 Sim. 9,* a covenant " not to erect any messuage or tenement, on any part of the ground at Pittville, which shall or may lessen or deteriorate in value any other of the messuages now erected or hereafter to be erected at Pittville,"

being under consideration, Vice-Chancellor Shadwell (at *p. 37*)
says : " Now the first observation which strikes me, and which
struck me from the time when I first read that covenant, is that
it is an extremely difficult one for a court to deal with (that is
to say) in the way of giving relief upon it ; because, if a house
has once been built upon a plot of ground, it is very difficult to
say that building a house on an adjoining plot of ground does
not, in some degree, deteriorate the value of the first house. It
is perfectly plain, however, that it was never the intention that
the covenant should have that construction ; because the deed
itself sets out with a sufficient manifestation of an intention that
all the ground which, on the map, is designated as building
ground, should, at some time or other, be covered with buildings ;
and, of course, one house must be built at one time and another
house at a subsequent time, and, therefore, the mere building of
a house which would necessarily deteriorate, in some measure, the
value of the house that was first built, never could be considered
as a breach of the covenant."

There was nothing in the scheme, or in the covenant, regulat-
ing the size, style, cost or position of dwellings, nor requiring
the improvement of the lots. The original proprietors bought
for the purpose of putting up comfortable yet inexpensive sum-
mer houses. It was, in the words of the complainant, to be a
" poor man's home or paradise." For a long distance the north-
erly portion of the tract, between the ocean and the Shrewsbury,
was nothing but a stretch of sand dunes. The beautiful lawns
and the palatial villas which have been since constructed were
not within even the dreams of the promoters of the enterprise.
If, as Vice-Chancellor Shadwell argues, the building of a house
on an adjoining lot must, to some extent, injuriously affect, for
dwelling purposes, the value of the adjoining property on which
a dwelling has already been erected, to a much greater extent
would an unsightly house on an uncultivated lot depreciate, if
adjoining, the value of one of the elegant establishments to be
found at Monmouth Beach. Yet there is nothing to control an
owner there in the character or quality of his dwelling except
his tastes and his means. He may put up a shanty or a hut,

:and occupy it as his abode, without violating his covenant, even though a want of style and unsightliness may have the effect to make his neighbor's property less desirable as a residence.

Certainly the erection of a stable on a lot must depreciate the value of adjoining property for a dwelling-house, and such value would be practically destroyed if the stable was built upon .a street upon which the owner of the adjoining lot desired to erect his dwelling. In this case the complainant has placed his .stable on Ocean avenue. It must seriously impair the value of .defendants' lot for dwelling purposes, and incalculably so, if they for any reason wished to build a house on or near the :avenue. Notwithstanding this fact, it cannot be said that in doing this complainant has violated his covenant, for the scheme of the original proprietors contemplated the building of stables by the owners of lots anywhere on the tract of four hundred .acres. Access to the railroad depots was only practicable by means of conveyances with horses, and each lot owner was expected to have his own turnout, humble though it might be. In .selecting the least objectionable location for stables, it was natural that they should want them as far from their dwellings as the lot would allow, and, as the bluff on the shore was the .choice spot for the house, the stables were placed at the other end .of the lot near the avenue. In course of time, however, as care, .cultivation and the expenditure of money demonstrated that the land was capable of great improvement, and the hedges and lawns succeeded the sand-waste on each side of the avenue, the :stables were found to detract from the beauty of the place and to be an annoyance to the owners of lots on the inland side of the avenue. This led to devoting a certain portion of the tract to stables. This collecting them in one locality must have injuriously affected the value of land near such stable tract, yet it .cannot be considered as a violation of the covenant, for it is but .carrying out the original plan in a way least annoying and injurious to the majority.

It seems to me plain that unless the use, which may, to some .extent, depreciate the value of neighboring property for dwelling purposes, is one which runs counter to the original purposes of

the promoters of the scheme, who exacted the covenant, it is not to be regarded as violating its restriction.

I do not find anything in the case which justifies the contention that any portion of this whole tract was to have any advantages given to it over any other portion, except such as would naturally arise from location.

The whole tract was laid out in lots, and these lots were offered to the public, but aside from natural advantages of situation, no one owner was to enjoy any privileges which were not to be enjoyed by every other.

Counsel for complainant assumed upon the argument that the lots upon the ocean, lying between it and the avenue, were devoted to the purposes of residences, but there is nothing in the case which separates the ocean lots from any other portion of the property as dedicated to any special purpose, or as entitling them to any greater consideration than any other lot upon the whole tract.

The covenant is as much enforcible in favor of the least as it is in favor of the most valuable lot upon the tract.

There can be no doubt that one of the purposes of the promoters was to furnish those who should join with them and become purchasers with the means and facilities of enjoying the uses and advantages of the ocean. The erection of the bathing pavilion on Beach road in 1871, for the use of the guests of the club-house and owners of the inshore cottages, as well as the laying out of the other roads from Ocean avenue to the ocean, make this clear, and the right of these persons to bathe at the foot of these roads would seem to admit of no doubt.

It could never have been the intention to confine the privilege of sea-bathing to those who were fortunate enough to own the ocean front lots, for as was said on the argument, if such was the case, the sales would have been limited to the lots enjoying those privileges, leaving the bulk of the property on the hands of the original proprietors.

Certainly it was contemplated, and not within the restriction of the covenant, that the owner of every ocean lot, or his tenant, could use his lot, in a reasonable way, for the purposes of bathing,

and for that purpose erect thereon a suitable bath-house for the accommodation of himself and members of his family. The size and capacity of such bathing-house could be limited only to the requirements of the family of the occupants of the property. It is difficult to understand, as contended for, why the right to build and use a bath-house upon a lot is to be restricted to lots upon which a dwelling-house is erected. I see nothing to prevent the owner of a house on one lot erecting his bath-house on another and unimproved lot if he is the owner or lessee and if the dwelling-house was occupied, as is one of the complainant's, as a boarding-house, it would be competent to erect on such lot, or on an adjoining one, bathing-houses of sufficient number or one of sufficient size to accommodate all of the occupants or boarders, including servants of said boarding-house.

Nor do I find anything which will prevent a number of the occupants of ocean lots from collecting their bathing-houses in a group upon the land of any one who might consent thereto, or from building one commodious enough for their accommodation.

Bathing on this shore is notoriously dangerous, and the purpose of having the bathing of a number of families take place at a certain point in charge of an experienced man would be in the line of safety and a plan to be favored rather than frowned upon, and if the owner or occupant of the land upon which such group of bathing-houses belonging to the several owners or occupants of ocean lots are placed consented thereto, I see nothing in this covenant or in the scheme of the original promoters of this plan which would prevent it.

As to the location of such bathing-houses, while it might be a desirable thing for adjoining owners that they should be concealed as much as possible, and if the bulkhead was so high that they could be placed upon the beach and out of sight, it would be a graceful thing and in the line of good feeling so to do, but there is nothing which would require it.

If the foregoing positions are sound, why may not the owner of an ocean lot permit the owner of an inland lot to occupy part of his property with a bathing-house for his accommodation, and if one, why not more?

Again, if A owns an ocean lot and an inland lot and, guided by his taste or any other reason satisfactory to himself, he builds his dwelling-house upon the inland lot, what is there to prevent him from using his ocean lot as a bathing place for himself and family, and if he is the proprietor of a boarding-house on his inland lot he would have the same right to use his ocean lot for his guests as would the proprietor of a boarding-house located on an ocean lot, and should be restricted only to the extent that the occupant of the ocean lot is, namely, the accommodation of himself, his family and his friends. He would have a right to maintain bath-houses, not only for the immediate members of his family, but also for any one that he may see fit to give the privilege of using them.

But it is said that the use made by the defendants of the Robinson lot is a menial one, which I understand to mean that the bath-houses which have been or may be put upon the property by the defendants will be subject to a charge for their use.

There is nothing in this covenant that restrains business except of certain kinds. There is certainly nothing there which could bring any use within its terms simply because it was a use which could not be enjoyed unless it was paid for. But if the objection was valid it would apply as well to the use of a house erected on a lot as a boarding-house. Witnesses testified that a large boarding-house there would depreciate the value of adjoining property as a private dwelling. If the use of property having such incidental effect, for a price, is a violation of the covenant, complainant, by leasing one of his houses for a boarding-house, brings himself within the known rule that one who himself does not observe, cannot enforce the restriction.

While it is true that witnesses have testified that in their opinion a bath-house at this place used by a large number would injure or depreciate the value of complainant's property, it is also true that the lot has been used for a number of years for just this purpose, aggravated by the erection of as unsightly a collection of sheds as could well be imagined, and yet the rental value of the complainant's property has not diminished, nor does it appear

De Gray v. Monmouth Beach Club House Co.

that he has attempted and failed in a sale of it.    So much for the practical effect of this use.

My conclusion is, that it was one of the purposes of the original promoters who exacted this covenant that those who were to become interested as purchasers should have facilities for the enjoyment of sea-bathing, and that the use of an ocean lot for such purpose by an owner of a lot on which there is or is not a dwelling-house is not a use within the restriction of the covenant,. and that the defendants, as the owners of the club-house property and the Robinson lot, have a right to the reasonable use of the latter for bathing accommodations.

Next, as to the restraint of the use of this lot by the defendants with the old bath-houses as stated in the amendment.    This use has been carried on by the defendants, or some of them, on this particular locality, to a greater or less extent, ever since the enterprise commenced.    At one time there was, as before stated, a pavilion at the foot of the street, between the complainant's lot and this property, erected there by the promoters of the scheme for the accommodation of themselves and cottagers who had no bathing-houses of their own.

It is true it stood a little upon the land of the complainant, and that he objected, not to the use of the bath-house, but to the fact that it was on his land, and required its removal, and it was removed into the lines of the street.    But from that time on the Robinson lot has been used by the club-house people to place their bath-houses upon it, and to the extent of making no effort to prevent such use complainant has acquiesced therein.    The defendant corporation may have bought this very property with a knowledge of such fact.

Cottagers who are not parties to this suit may have also invested money with this use in view, and the rule is invoked, and it seems to me should be applied, that this acquiescence is fatal to complainant's demand for relief, even if he were otherwise entitled to it.    *Sayers* v. *Collyer, 28 Ch. D. 103.*    As the injunction was against a new device and not against an accustomed use the erection of the old bath-houses cannot be considered as a contempt.

De Gray v. Monmouth Beach Club House Co.

Complainant objects to the great number who bathe adjoining his property, the noise which they make, the presence of the bathers in their bathing clothes on the beach, and other similar objections. Such conditions are the almost invariable incidents of parties bathing on the seashore. The annoyance therefrom, if any, is one which would affect a person in a greater or less degree, according to his temperament, but the abuse of the privilege might be so great as to give a neighbor the right to have it abated as a nuisance. While there may have been occasions when the patience and good nature of the complainant may have been much tried, and when he had just ground of complaint, I do not think the evidence shows that the use, so far, by the defendants of this lot for bathing has been such as to render them subject to an injunction for maintaining an actionable nuisance, as causing "an inconvenience materially interfering with the ordinary comfort, physically, of human existence, not merely according to elegant and dainty modes and habits of living, but according to the plain and sober and simple notions among the people." *Walton* v. *Selfe, 4 De G. & Sm. 322; Solton* v. *De Held, 2 Sim. (N. S.) 133; Cromp* v. *Lambert, L. R. (3 Eq. Cas.) 408.*

In conclusion, in my opinion, the covenant invoked would not justify the court in restraining the reasonable use of this lot by the defendants as a bathing place, or the erection of a suitable bathing-house for the accommodation of the club-house guests and the cottagers, but not one of a character to entertain the public. The evidence taken on the trial has confirmed the impression under which the injunction was ordered, that a casino or pavilion, on the plans presented, which would necessarily attract strangers, and so arranged as to provide them with accommodation, and a place for lounging or refreshment, should not be permitted in the face of the covenant. The evidence shows that these plans were the development of the views of Mr. Houghton, but the company is now the owner of the lot and the party which controls its occupancy and use. While Mrs. Houghton and her family are the owners of a majority of the stock of the company, there has been no corporate acceptance of the plans, nor any action on its part which would justify one in saying

Edgerton v. Electric Improvement &c. Co.

they intended or threatened to erect such a building. They have the right to use the lot as a bathing place, but should do so in a way to be least injurious to the neighboring dwellings, and while a casino, with its attendant annoyances, should not be countenanced, a suitable building not of that character, but sufficiently commodious for the accommodation of those they have a right to provide for, would certainly be preferable to the dilapidated, unsightly sheds which have formerly been placed there. If the use of such a bathing-house should be such that it became, so to speak, a nuisance, then this court ought to interfere and restrain such misuse. So that, in my view, the whole question comes down, at last, practically, to the point that the right of the complainant to appeal to the court for relief can only be founded upon an improper use by defendants of their club-house or bathing-house, if they should erect one on the Robinson lot and attempt to carry it on. It is a restraint of management rather than of erection, and until mismanagement occurs the complainant has no standing in the court.

I advise that the injunction be dissolved, and the order to show cause be discharged, and the bill be dismissed.