The bill in this cause is filed to restrain the alleged violation of certain restrictive covenants affecting land of the defendant located in Monmouth Beach, New Jersey. The complainants are the owners of property located on Ocean avenue, Monmouth Beach, New Jersey, adjacent or near to the property of the defendant. Both the properties of complainant and defendant consist of lots which are part of a large tract of land in Monmouth Beach, laid out in 1871 by an association known as "Monmouth Beach Company." This *Page 290 
tract was laid out according to a map drawn by K. Forsberg, and filed in 1872 in the clerk's office of Monmouth county. Pursuant to the plan of development a draft of restrictive covenants was prepared and printed forms of deeds containing this covenant were also prepared. Almost uniformly thereafter all deeds for lots in this tract contained the restrictive covenant alluded to, and which read as follows:
"That the party of the second part, his heirs and assigns, will not at any time hereafter erect or permit upon any part of the said land any hotel, drinking saloon, gaming-house, slaughter-house, furnace, manufactory, brewery, distillery or building for the curing of fish, or for any other uses or purposes that shall depreciate the value of the neighboring property for dwelling-houses."
The defendant is a business corporation organized under the laws of New York.
Without going into the details of the various conveyances of the parties, it may be stated that the complainants have the right to enforce the covenant if it is being violated, and the defendant, having purchased its land expressly subject to the restrictions, is bound thereby. On the defendant's lots there is erected a large and commodious dwelling-house of, approximately, twenty rooms. The complainant Miller lives on the property immediately adjoining the property of the defendant on the north, and resides there during the summer season. The defendant purchased its property in February, 1923, and during the summer of that year and the following year the dwelling-house was occupied by the stockholders of this corporation and their families. The alleged violations of the restrictive covenant above recited relate to the uses to which the property of the defendant is being put, and the conduct of those who occupy and use the property during such use and occupancy. The first objection is that the dwelling-house is being "used as a boarding-house for people of a very objectionable type, there being frequently as many as seventy-five persons accommodated therein, who, with their children, make a great noise and conduct themselves in such a manner as that the whole neighborhood was aroused;" that the dwelling-house contained too many beds, *Page 291 
as many as three beds being contained in one room; that the conduct of the persons occupying the premises of the defendant is, apparently, intended to compel the complainants, or some of them, to purchase the defendant's property at a high price, and that in pursuance of this plan the defendant, during the month of August, 1924, advertised its property for rent as a home for colored people at a nominal rent. There is no specific allegation in the bill that the defendant is maintaining a nuisance in the use or conduct of its property, and the prayer for relief is based distinctly upon an allegation of violation of the restrictive covenant above cited.
The defendant denies that it has in any sense violated the covenant, or that it is conducing a boarding-house, or that it has any designs to compel the complainants, or any of them, to purchase its property, and claims that the whole objection of the complainants to the defendant is based upon the fact that the officers and stockholders of the defendant company, who, with their families, occupy the premises in question from time to time, are Jews, and that it is the purpose of the complainants to exclude them from Monmouth Beach for this reason.
The evidence submitted on the part of the complainants to sustain their allegation of violations of the restrictive covenant is to this effect: that during the summer of 1923 the use and occupancy of the defendant's property was not objectionable, but that in the summer of 1924 the dwelling-house was occupied by a number of families far in excess of the normal capacity of the house; that, as a result thereof, the sewage and drainage system was overtaxed, the cesspool overflowed, so that an intolerable condition existed on the premises and resulted in protests on the part of the municipal authorities; that there are too many beds in the house, in some instances as many as two or three beds in one room, and that at times some of the occupants of the house slept on the porch; that the occupants at times have community affairs with singing, with fifty or sixty voices; that many automobiles are parked on the lawn at times, and that a large garage for the accommodation of the automobiles of *Page 292 
the occupants, which garage is described as a "shed," has been erected in the back yard; that some of the children played baseball in the yard on Sunday, and that, in general, the occupants talked, sang and laughed in a boisterous manner; that the dwelling-house was intended as a one-family house, and that the use of the house by so many people should not be permitted; that the occupants at times sat upon the veranda in their bathing suits and shirt sleeves, and that they would parade the streets while clad in their bathing suits in front of complainants' property when going to and from the bathing beach.
On behalf of the defendant, the evidence showed that the officers and stockholders of the defendant company were fourteen in number, nearly all Hebrews, most of them professional men and others engaged in mercantile business in New York City; that the property was first purchased with the idea of using it as a business enterprise, but when the officers and stockholders found that they could not make much of a business enterprise out of it, they decided to use it as a summer residence for themselves and their families. Consequently, during the summers of 1923 and 1924 the officers and stockholders of the corporation sent their families there, and the place was operated on a sort of community or club plan, each person contributing his proportionate share of the expenses. Not all of the officers and stockholders and their families were at the house at any one time, they, apparently, alternating; the greatest number of people being there at week-ends and on holidays. Many of the officers and directors of the defendant company testified at the hearing in this cause, and the highest estimate of the number of people who occupied these premises at any one time was from twenty-five to thirty. They admitted the overflowing of the cesspool, but explained it by saying that one of the drain pipes was broken by an automobile driving over it; that they had some difficulty in having it repaired, and that, pending repairs, the conditions complained of existed. Everybody agreed that this condition had been remedied at the time of the trial. Defendants admit that they at times had *Page 293 
music and singing on the premises, when all of the occupants who could sing, or who thought they could, joined in the singing of popular airs; that there were present some artists of note who had performed for the entertainment of the occupants of the dwelling, but claimed that the noise from these musical affairs was not unusual nor more annoying to their neighbors than was the music and singing at complainants' home annoying to them. They denied that more than two beds were contained in any one of the bedrooms of the house, and that that was only where arrangements were made for the children to sleep in the same room with their parents. Defendant admits advertising the place for rent to colored people, but claims that, as a matter of fact, it never had any intention of so doing; that the advertisement was placed in the paper as a result of a threat on the part of the complainants to drive the defendant out of town.
It is difficult to determine just how the complainants find a violation of the restrictive covenant resulting from the act complained of. It is urged that the use to which the property of the defendant is put has resulted in a depreciation in the value of surrounding property, and that, therefore, this use is in violation of the covenant. This covenant has already been construed and explained by this court in DeGray v. MonmouthBeach Club House, 50 N.J. Eq. 329, where Vice-Chancellor Green, in an elaborate opinion, analyzed the whole covenant. There an injunction was asked against the erection of a large bathing pavilion on the beach front, which it was alleged was a violation of the covenant. The injunction was denied, however, on the ground that the covenant did not prohibit the erection of such a building, and that, as the erection of the building was not in violation of the restriction, relief could be had only upon a showing of improper use of that building, such as would constitute a nuisance. In that case the court said, at page 346:
"I do not think the inhibition of particular kinds of business which, with the possible exception of a hotel, may be *Page 294 
classified as tending to impair health or comfort, or to be injurious to the morals or peace of the neighborhood, is to be considered as limiting the general provisions at the end of the covenant to uses of the character of those specified.
"Nor do I think the general clause is to be given a construction that would forbid any use which in any degree might unfavorably affect the value of neighboring property."
And at pages 347, 348:
"There was nothing in the scheme, or in the covenant, regulating the size, style, cost or position of dwellings, nor requiring the improvement of the lots. The original proprietors bought for the purpose of putting up comfortable yet inexpensive summer houses. It was, in the words of the complainant, to be a `poor man's home or paradise.'
 * * * * * * * * *
"The beautiful lawns and the palatial villas which have been since constructed were not within even the dreams of the promoters of the enterprise.
 * * * * * * * * *
"Yet there is nothing to control an owner there in the character or quality of his dwelling except his tastes and his means. He may put up a shanty or a hut and occupy it as his abode, without violating his covenant, even though a want of style and unsightliness may have the effect to make his neighbor's property less desirable as a residence.
"Certainly, the erection of a stable on a lot must depreciate the value of adjoining property for a dwelling-house, and such value would be practically destroyed if the stable was built upon a street upon which the owner of the adjoining lot desired to erect his dwelling. In this case the complainant has placed his stable on Ocean ovenue. It must seriously impair the value of the defendant's lots for dwelling purposes, and, incalculably so, if they, for any reason, wished to build a house on or near the avenue. Notwithstanding this fact, it cannot be said that in doing this complainant has violated his covenant, for the scheme of the original proprietors contemplated the building of stables by the owners of lots anywhere on the tract of four hundred acres. *Page 295 
Access to the railroad depots was only practicable by means of conveyances with horses, and each lot owner was expected to have his own turnout, humble though it might be."
And at pages 348, 349:
"It seems to me plain that unless the use which may, to some extent, depreciate the value of neighboring property for dwelling purposes, is one which runs counter to the original purpose of the promoters of the scheme, who exacted the covenant, it is not to be regarded as violating its restrictions."
And at page 350:
"I see nothing to prevent the owner of a house on one lot erecting his bathhouse on another and unimproved lot if he is the owner or the lessee, and if the dwelling-house was occupied, as is one of the complainant's, as a boarding-house, it would be competent to erect on such lot, or on an adjoining one, bathing-houses of sufficient number or one of sufficient size to accommodate all of the occupants or boarders, including servants of said boarding-house."
And at page 351:
"There is nothing in this covenant that restrains business except of certain kinds."
And at page 353:
"Complainant objects to the great number who bathe adjoining his property, the noise which they make, the presence of the bathers in their bathing clothes on the beach, and other similar objections. Such conditions are the almost invariable incidents of parties bathing on the seashore. The annoyance therefrom, if any, is one which would affect a person in a greater or less degree, according to his temperament, but the abuse of the privilege might be so great as to give a neighbor the right to have it abated as a nuisance. While there may have been occasions when the patience and good nature of the complainant may have been much tried, and, when he had just ground of complaint, I do not think the evidence shows that the use, so far, by the defendants of this lot for bathing, has been such as to render them subject to an injunction for maintaining an actionable nuisance, as *Page 296 
causing `an inconvenience materially interfering with the ordinary comfort, physically, of human existence, not merely according to elegant and dainty modes and habits of living, but according to the plain and sober and simple notions among the people.'"
I have quoted thus largely from Vice-Chancellor Green's opinion in the DeGray Case, because in that opinion he touches the principle upon almost every phase of the instant case, and I feel that I am bound by that decision. But a careful reading of the covenant rather indicates, to my mind, that the acts and conduct of those who use and occupy this defendant's premises, and which are the subject of this complaint, do not come within the prohibitions of the covenant at all. It will be noted that the covenant is not to "erect or permit upon any part of said landany hotel * * * or building for the curing of fish, or for anyother uses or purposes that shall depreciate the value of theproperty for dwelling-houses." The inhibition is against buildings intended for certain uses, and, as I read the covenant, unless it can be determined beforehand that the building is intended for a use specifically prohibited or a use that will depreciate the value of adjoining property, the building is not objectionable. The restriction is not against the use to which the lot is to be put, but is against the erection or permitting on the lots of buildings intended for particular purposes. It is strictly a building restriction. It is not a covenant against nuisances and trade, and applying the rule of strict construction, which it is uniformly held should be applied to covenants of this character, I apprehend that, if relief is to be granted in this case, it must be granted on the ground that the defendant is maintaining a nuisance, and not that its conduct and use of its property is in violation of the restrictions. As I have indicated above, there is, however, no specific charge of a nuisance in the bill of complaint, but I shall, nevertheless, consider the evidence as though there had been a specific charge of maintaining a nuisance by the defendant. *Page 297 
What, then, are the specific facts which might be alleged to constitute a nuisance? First, that the defendant permits a large number of persons to occupy its dwelling-house. The testimony is conflicting on the point as to the maximum number of persons that have occupied the dwelling at any one time, complainant claiming there were from seventy-five to one hundred people there, and defendant claiming the number to be not more than twenty-five or thirty. I am inclined to accept the defendant's estimate, as the officers of the defendant who testified certainly had a better opportunity to determine the number of occupants of the dwelling than would the witnesses for the complainants, and I am inclined to believe that the complainants' ideas of numbers were somewhat exaggerated by their state of mind. I know of no law, however, which would permit this court to limit the number of persons who might occupy any particular dwelling-house which was not subject to the Tenement House act, and there is no claim here that this dwelling is subject to that act. Certainly, this court cannot control a man in the number of guests he may have at his home nor in the number of members of his family who may occupy his home. If a bathhouse may be used by the "owner, his family and his friends," without restriction as to number, as was held in theDeGray Case, why cannot a dwelling-house? Nor can the objection that the occupants of this dwelling are Hebrews, and that they sit on the porch in their shirt sleeves and bathing suits have any weight, and an examination of the bill of complaint show that this is really the gravamen of the offense charged, for the bill states that the defendant's house is being "used as aboarding-house for people of a very objectionable type." But it was held in the DeGray Case that a boarding-house did not come within the purview of the covenant. And there is nothing in the covenant nor in the laws of this state which prohibits members of the Jewish faith, or any other faith, from purchasing and owning land on this tract and living thereon. And even if such prohibition did exist, I should be obliged to hold it unconstitutional and void. Even the expressed intention of leasing *Page 298 
the property for a home for colored people is not, in my judgment, a ground for injunction.
The use of the street by bathers clad in their bathing suits is, perhaps, more properly a matter to be regulated by municipal ordinance than by the restraining order of this court. In fact, some of our seashore municipalities have already adopted this course — others not — depending to some extent upon the whim of the city fathers. The decision in the DeGray Case clearly holds that it was the intention of the promoters of this tract that ocean bathing should be freely enjoyed by all. And it would be a far stretch of the powers of this court, in this day of one-piece bathing suits, to hold that the defendant was guilty of maintaining a nuisance, because the occupants of its cottage walked the streets clad only in their bathing costumes. It may be that the bather of yesteryear, clothed in the bathing costume of 1871 (the date of the covenant), was a less objectionable sight than the bathing beauty of to-day. But judging from the popularity of the bathers' parades staged at some of our seashore resorts, the modern bathing beauty is not so uniformly objectionable to the eye as to justify the exercise of the injunctive powers of this court in excluding bathers from the streets of a seashore resort.
The erection of garages on defendant's property for the accommodation of the occupants of the dwelling-house is not a violation of the covenant, nor does it constitute a nuisance. What Vice-Chancellor Green said in the DeGray Case with reference to stables is particularly applicable to this phase of the complainant's case. Automobiles have supplanted the horse to a great extent, and garages have been substituted for stables. It is probable that the conditions resulting from the break in the sewer, if maintained, would be considered a nuisance, but it is admitted by all the parties that this condition has been remedied; nor does the fact that two or more beds were set up in some of the bedrooms in this dwelling-house warrant this court in finding it a nuisance. While such a condition, persisted in, might be an unhealthy one for the occupants of the room, I do not see how it could *Page 299 
interfere materially with the neighbors, nor that the neighbors have any valid ground for objection; nor do I think the fact that some of the occupants slept on the porch at times (if they did, which is denied), can be held to be a nuisance. Sleeping porches are quite common in these days, and if persons may sleep on a porch designed for that purpose, without objection, why not on any porch, so long as they comport themselves with decency? Nor can I say how many popular songs may be sung in a private residence of an evening or how much music or what kind may be produced there, or whether those songs must be rendered in English or Yiddish. It is quite true that a class of music which may be entertaining to one may be annoying to another, but those who enjoy the modern jazz cannot be restrained from producing it because it offends the classical ear; nor is it possible to restrain irrepressible youth, which must give vent to its excess energy in games played on Sunday. I do not mean to intimate that excessive noise or boisterous conduct in the defendant's dwelling, if amounting to a nuisance, could not be restrained by this court. Even jazz or classical music might be produced to such an extent as to become a nuisance, and games might be played with such zest and vigor, and for such a length of time as to materially interfere with the occupancy of complainants' homes, and to such an extent as to warrant injunctive relief. But the noisy conduct complained of here is, to my mind, nothing more than might be expected in a seashore home occupied by a considerable number of persons seeking recreation and pleasure. There is no testimony indicating that the occupants of defendant's cottage did not comport themselves with decency, and, apparently, there was no disturbance requiring the intervention of the police. It is quite plain that what the complainants really object to in this case is that the officers and stockholders of the defendant company and their families are not in the social class of the complainants. This is shown by the statement of one of the complainants, when he said: "I cannot very well describe it, except that you cannot see it any other place along the coast where people sit on the veranda in their *Page 300 
bathing suits and shirt sleeves, and their whole appearance is that of what might be called `rabble.'" The complainants, perhaps, are, in their habits of living, more elegant and dainty than the occupants of the defendant's property. They represent, apparently greater wealth, and are able to maintain a higher standard of living than is within the means of the defendants; but conditions alleged to constitute a nuisance must be gauged, "not merely according to elegant and dainty modes and habits of living, but according to the plain and sober and simple notions among the people." There is no evidence in this case which would warrant the court in finding that any depreciation in the properties in Monmouth Beach has resulted from the occupancy of the defendant's property by its officers, stockholders and their families, on the contrary, the testimony which was directed to this point indicated that there had been no lessening in rental values nor any vacancies resulting from defendant's conduct. No sales were indicated at a less price than might have been obtained prior to defendant's advent. I find no evidence to warrant me in finding that the restrictive covenant has been violated, nor is there sufficient evidence on which to base a finding of nuisance. I shall, therefore, advise a decree dismissing the bill of complaint.