CHARLES COUDERT

*v.*

MARCUS SAYRE.

1. The dominion which the law gives every landowner over his land, when he owns it in fee, invests him with power, when he conveys a part, to impose such limitations upon its use as will prevent his grantee, and those claiming under him, from making any use of the part conveyed which may impair the value of the part retained.

2. The only limitation upon this power is, that it must be exercised reasonably, and with a due regard to public policy.

3. Such restrictions, whether they run with the title or not, may be enforced in equity against any person acquiring title with notice of them.

4. A covenant that confers an immediate, permanent and beneficial effect on the use to which the real estate is designed to be applied, will run with the title.

5. When by the construction of a grant it appears that it was the intention of the parties to create or reserve a right, in the nature of a servitude, in the land granted, for the benefit of other land owned by the grantor, no matter in what form such intention may be expressed, such right, if not against public policy, will be held to be appurtenant to the land of the grantor, and binding on that conveyed to the grantee, and the right and burthen thus created and imposed will pass, with the lands, to all subsequent grantees.

6. One person is without the least power or capacity, in the absence of a delegation of authority, to release or change the rights of another in land.

7. The doctrine of implied covenants and grants rests on the presumed intention of the parties, and no right or duty can be created by implication when it is necessary to disregard known facts to make the implication on which the right or duty rests.

On final hearing on bill and answer and proofs taken in open court.

*Mr. Robert L. Lawrence,* for the complainant.

*Mr. Thomas N. McCarter,* for the defendant.

VAN FLEET, V. C.

The case which the complainant lays before the court, as the foundation for the relief he seeks, is one of extreme novelty. Stated generally, it must be said that the complainant is before the court asking to be relieved, as against the defendant, from the obligation of a covenant which he made voluntarily, fully understanding what he was doing, entirely uninfluenced by fraud, and without the least mixture of accident or mistake. To present his case so that it may be easily understood, it will be necessary to state the facts out of which it arises somewhat in detail.

The covenant which the complainant asks to have nullified is contained in a deed made by John G. Vose and wife to the complainant, bearing date the 15th day of May, 1867. The deed conveys four acres of land. The land is described in the deed as " being part of the estate called Montrose," the different parts of which, the deed says, were conveyed to Mr. Vose by ten different conveyances, the dates of which, together with the names of the grantors and the dates and places of registry, are all re-cited. Immediately following the description of the land conveyed, the deed says, the premises conveyed by it are shown on map of Montrose, dated January 1st, 1867, which is filed in the office of the register of Essex county, and consist of a portion of lot No. 16 on said map. By this deed the complainant, for himself, his heirs and assigns, covenanted with his grantor, his

heirs and assigns, that the land conveyed by the deed should not at any time thereafter be used or occupied for the erection or maintenance of any slaughter-house—the covenant then designates by name almost every kind of building which may be used for trade or manufacture—and then says:

"Or for any other purpose whatsoever which can or may be unwholesome or offensive to the neighboring inhabitants, or for the erection of any buildings of any kind or description, excepting one dwelling-house, with the appropriate gardener's cottage."

The covenant then designates a number of other buildings, and concludes with these words, "and other buildings and offices appropriate for a gentleman's country residence." The complainant further covenanted for himself, his heirs and assigns, that the covenant he had just made, restricting the uses to which the land conveyed to him could be appropriated, should attach to the land and run with its title, and that the covenant should be inserted in all future conveyances and other instruments whereby the title to his land should be transferred or affected, and that the covenant should forever thereafter be recognized, sustained and upheld; and that it should not only be lawful for the complainant's grantor, his legal representatives or assigns, but also for the owner or owners of any of the property mentioned in the deeds thereinbefore recited—meaning the ten deeds by which the land called the Montrose estate had been conveyed to the complainant's grantor—to institute and prosecute any suit or proceeding, at law or in equity, for a violation, or threatened violation, of the covenant; it being understood, as the covenant declares, that the covenant should not be enforced personally against the complainant unless he was the owner of land to which it related when its violation was threatened or committed.

These are the restrictions which the complainant voluntarily consented should be put upon the uses to which the land conveyed to him might be appropriated when he accepted its title. It is not claimed or pretended that the deed to him does not, in every respect, conform precisely to his contract of purchase, and give him just such a title as by his contract he was entitled to

Coudert v. Sayre.

receive. Nor is it pretended that the deed puts a single restriction on the use of the land which the complainant did not deliberately agree to by his contract of purchase. Hence, in the discussion of this case, it must be regarded as a fact entirely free from dispute, that every fetter or restriction which these covenants place upon the land in question was placed there with the complainant's full consent; and, in addition, that he bargained for a title thus clogged, and only paid such price for the land as he believed it to be fairly worth, subject to a perpetual restriction as to the purposes for which it could be used. There can be no doubt that the dominion which the law gives every landowner over his land, who owns it in fee, invests him with good right and full power, when he conveys a part, to impose such limitations upon its use as will prevent his grantee, and those claiming under him, from making such use of the part conveyed as may impair or diminish the value of the part which he retains. As was said by Mr. Justice Bigelow, afterwards chief-justice of the supreme court of Massachusetts, in *Whitney* v. *Union Railway Co., 11 Gray 359, 363:* "Every owner of real property has a right to so deal with it, as to restrain its use by his grantee, within such limits as to prevent its appropriation to purposes which will impair the value or diminish the enjoyment of the land which he retains. The only restriction on this right is, that it shall be exercised reasonably, with due regard to public policy, and without creating any unlawful restraint of trade."

So far nothing has been said respecting the defendant's position in the case. His connection with the complainant arose in this way: The complainant's grantor, on the 1st day of June, 1868, conveyed to Samuel Schoch two tracts adjoining the four acres conveyed to the complainant the previous year. These two tracts lie adjacent to each other, and form one body. One of the tracts contains one and seventy-five hundredths acres, and the other one and fifty-nine hundredths acres. The deed to Mr. Schoch states that these two tracts are shown as lots Nos. 9 and 10 on a map of property at Montrose, dated April, 1868, and filed in the office of the register of the county of Essex. They were conveyed subject to a restriction, respecting the uses to

which they could be appropriated, precisely similar to that contained in the deed to the complainant, except that their owner has a right to erect two dwellings, such as would be suitable for a gentleman's country residence, on each tract. These two tracts were, on the 23d day of October, 1877, conveyed by Mr. Schoch to the defendant, who, soon after his purchase, expended, in the erection of a large and handsome dwelling and other buildings, and in improving and beautifying the whole surface of the tracts, over $35,000. The proofs show that the defendant made his purchase after he had examined the complainant's deed. The defendant swears that the complainant's covenant, restricting the uses to which his land could be appropriated, operated as a strong inducement to him to purchase. It was by means of the conveyances from the complainant's grantor to Mr. Schoch, and from Mr. Schoch to the defendant, that the defendant has acquired whatever right he now has to the benefit of the complainant's covenant.

The complainant does not ask for a decree declaring that the whole of his covenant is without force in favor of the defendant, but merely that such declaration be made so far as his covenant restricts the number of dwellings which may be erected on his land. As to the other parts of his covenant, he asks no declaration or other aid. The reason it has become important to the complainant to get the declaration he asks, if he can, is this: In 1881 he conveyed one acre of his four to another person, who subsequently erected a dwelling on it. He still retains the title to the other three, so that it will be perceived, if the defendant is entitled to the benefit of the complainant's covenant, and will have a right to seek redress against him if he violates it, that the complainant has, by his own act, placed the three acres which he still retains in a position where his right to use them as a site for a dwelling may always be challenged by the owner of the defendant's land. This is the situation which has induced the complainant to attempt to free himself from his obligation.

The validity of the covenant between the original parties is not disputed. No claim is made that the covenant was originally without force, because against public policy, or beyond the

Coudert v. Sayre.

capacity of the contracting parties. Covenants of this kind, which either add to the value or desirability of the land retained or conveyed, and which do not in any way impose an unreasonable restraint upon trade or industry, have, as I think an examination of the authorities clearly shows, uniformly been upheld and enforced. The purpose of the covenant in question is manifest. There can be no doubt that its purpose was to confer a benefit on the grantor's adjacent land, by restricting the number of habitations which should be erected on the four acres, thus securing forever to the grantor's adjacent land full protection against the discomfort and danger resulting from being surrounded by a dense population, and also the advantages arising from an attractive prospect and an almost unobstructed view over the four acres, together with the benefit that would flow from a free and unobstructed passage of light and air over the four acres. The benefits which the grantor intended by the covenant to confer on his adjacent land, are, in all material respects, substantially like those which would be conferred by a grant of land, abutting on other land of the grantor, which he, by his grant, covenants shall forever remain open as a park or garden. It is well settled, that a covenant of the kind just mentioned will, whether it runs with the land or not, be enforced, not only against the covenantor, but also against any person claiming under the covenantor with notice of the covenant. The principle laid down by Lord Cottenham on this subject, in *Tulk* v. *Moxhay, 2 Phil. 774,* has been followed by this court, and also by the court of errors and appeals. *Kirkpatrick* v. *Peshine, 9 C. E. Gr. 206, 213; Brewer* v. *Marshall, 4 C. E. Gr. 537, 543.* The following is Lord Cottenham's statement of the principle (*p. 777*): "That this court has jurisdiction to enforce a contract between the owner of land and his neighbor purchasing a part of it, that the latter shall either use, or abstain from using, the land in a particular way, is what I never knew disputed. Here * * * the owner of certain houses in the square sells the land adjoining, with a covenant from the purchaser not to use it for any other purpose than as a square garden. And it is now contended, not that the vendee could

violate that contract, but that he might sell the piece of land, and that the purchaser from him may violate it without this court having any power to interfere. If that were so, it would be impossible for an owner of land to sell part of it without incurring the risk of rendering what he retains worthless. It is said that, the covenant being one which does not run with the land, this court cannot enforce it. But the question is, not whether the covenant runs with the land, but whether a party shall be permitted to use the land in a manner inconsistent with the contract entered into by his vendor, and with notice of which he purchased. Of course, the price would be affected by the covenant, and nothing could be more inequitable than that the original purchaser should be able to sell the property the next day, for a greater price, in consideration of the assignee being allowed to escape from the liability he had himself undertaken." The same principle controlled the decision of Chancellor Walworth, in *Hills* v. *Miller, 3 Paige 254,* and also in *Trustees of Watertown* v. *Cowen, 4 Paige 510.*

It would appear, then, to be entirely clear that the validity of the covenant under consideration, both as against the complainant and any person who may succeed to his title with notice of the covenant, is free from the least doubt. It follows, necessarily, that the making of the covenant was effectual in putting a burthen on the land conveyed for the benefit of the land retained. This being so, it would seem to follow, as a logical sequence, that the defendant, by the acquisition of a part of the land benefited by the covenant, has succeeded, in respect to that land, to the covenantee's rights under the covenant. The covenant, it will be remembered, expressly declares that it shall be lawful for any person who shall become the owner of any of the land described in the ten deeds recited in the conveyance to the complainant, to maintain an action for a violation of the covenant against such person as may be the owner of complainant's land when the violation is committed. The language of the covenant makes it certain, beyond all doubt, that the parties mutually intended that the restrictions put upon the land conveyed should have the effect to confer an important benefit on the grantor's

adjacent land. This benefit consisted, as already shown, in protection against a dense population, and in securing to the owner of the adjacent land an attractive prospect, an unobstructed view and a free passage for light and air. These are things which, according to long-established principles of law, may be annexed to land, so as to be made an essential and valuable part of it, and to pass with a transfer of its title. If this were not so, it will be seen at a glance that such covenants, instead of being the means by which parties can give effect to their mutual purpose, would be without effect, except to mislead and deceive. But that is not the law. On the contrary, the law is well settled, that the rights created by such covenants are transferable as part of the land to which they are attached, and where, as in this case, a grantor restricts the use of the land which he conveys, for the benefit of land which he retains, his subsequent conveyance of the land retained will pass such benefit to his grantee.

Indeed, under the principle established by the decision of the supreme court, in *National Bank at Dover* v. *Segur, 10 Vr. 173,* I think it must be held that the covenant in question runs with the land held by the defendant, so that if it shall be broken, while he still retains the title, he may maintain an action at law for its breach. The action in that case grew out of the following facts: Segur was doing business at Dover as a private banker; he had commenced the erection of a banking-house on a lot he owned there; while the building was in course of erection he agreed to sell the building and lot to one Hoagland; the contract stated that Hoagland's object in making the purchase was to form a banking corporation, and then convey the property to such corporation; Segur agreed that when the corporation commenced business he would withdraw from business, and not re-engage in business, as a private banker, in the borough of Dover, at any time within ten years thereafter; he also agreed that his covenant to withdraw and abstain from business should run with the land he had agreed to convey, and that, in case he broke it, the owner of the land, at the time the breach was committed, should have a right to maintain an action at law against him for its breach. After the property had been conveyed to the bank,

Segur violated his covenant, and the bank sued him. Segur demurred to the declaration filed in the case, and the question thus presented was, whether Segur's covenant was so annexed to the land as to pass with its title, and confer upon the holder of the title a right to maintain an action at law for its breach. The distinction between the two covenants, in respect to their affinity to the title to land, it will be observed, is plain and wide. Segur's covenant simply put a restraint upon his future personal conduct—it is true, that the restraint would, if observed, result in benefit to the owner or occupier of the land on the sale of which the covenant was made, but the benefit was to flow exclusively from Segur's pursuing a particular line of personal conduct—while in the case in hand the covenant restricts the uses to which land shall be put; and it is clear, beyond question, on the face of the covenant itself, that the well-understood purpose of the parties, in laying the restriction on the land conveyed, was to confer a perpetual benefit on the land retained. This being so, it is impossible for me to discover any reason, of either justice or policy, why the benefit conferred by covenant on the land retained should not, on a grant of any part of it, pass to its grantee. That it will pass, so as to give its grantee a right to maintain an action at law for its breach, seems to be definitely settled by the decision in the case last cited. Chief-Justice Beasley, in pronouncing the opinion of the court in that case, said (p. 184): "It is not easy to see why any contract, which is of a nature to attach to the land, and which has a beneficial tendency, should not be considered assignable, by act of law, as against the covenantor, with the title. In every instance where the question, in this form, is presented, the suit being between the original covenantor and the alienee of the covenantee, if the making of the covenant be not denied, the sole point for solution would seem to be, whether such covenant, in the legal sense, relates to or concerns the land, for, if it does, by its quality it passes as an incident to the property, and is enforceable in the name of the person who is the owner at the time of its breach. When the covenantor has been the party sued, and the covenant admittedly relates to the land, the alienee of the covenantee being

the plaintiff, I think no considered case has held that such action was not maintainable."

But, as I understand the authorities, the defendant's right to the benefit of the complainant's covenant does not at all depend upon the defendant's ability to maintain an action at law against the complainant for its breach. The doctrine now in force on this subject I understand to be this: that when it appears by the true construction of the terms of a grant that it was the well-understood purpose of the parties to create or reserve a right, in the nature of a servitude or easement, in the property granted, for the benefit of other land owned by the grantor, no matter in what form such purpose may be expressed, whether it be in the form of a condition, or covenant, or reservation, or exception, such right, if not against public policy, will be held to be appurtenant to the land of the grantor, and binding on that conveyed to the grantee, and the right and burthen thus created and imposed will pass with the lands to all subsequent grantees. And any grantee of the land to which such right is appurtenant, acquires, by his grant, a right to have the servitude or easement, or right of amenity, as it is sometimes called, protected in equity, notwithstanding that his right may not rest on a covenant which, as a matter of law, runs with the title to his land, and notwithstanding that it may also be true that he may not be able to maintain an action at law for the vindication of his right. The cases in which this doctrine has been recognized and enforced are quite numerous, but only a few will be cited. *Brewer* v. *Marshall, 4 C. E. Gr. 537; Kirkpatrick* v. *Peshine, 9 C. E. Gr. 206; Gawtry* v. *Leland, 4 Stew. Eq. 385; Whitney* v. *Union Railway Co., 11 Gray 359; Parker* v. *Nightingale, 6 Allen 341; Schwoerer* v. *Boylston Market Association, 99 Mass. 285; Hills* v. *Miller, 3 Paige 254; Coles* v. *Sims, 5 DeG., M. & G. 1; Western* v. *MacDermott, L. R., 1 Eq. Cas. 499; S. C. on appeal, L. R., 2 Ch. App. 72.*

The discussion thus far has, I think, demonstrated that two things may be considered settled : *First*, that the covenant under consideration was originally valid ; and, *second*, that so long as the covenant shall remain in force, any grantee of the land bene-

fited by the covenant will take, with the land, the benefit con-ferred on it by the covenant. This brings us to the point where it becomes necessary to examine the grounds on which the complainant rests his right to relief. He alleges two. He says, first, that his grantor has released or canceled the covenant in question. This is true to this extent, that the complainant's grantor, in November, 1869, executed a writing by which he so far modified the covenant as to permit the complainant to erect more than one dwelling on the four acres, without, however, saying how many, provided each house was of a designated class or kind. But this modification, it will be observed, was made more than a year after the land now held by the defendant had been conveyed to Mr. Schoch. It certainly requires no argument to show that the complainant's grantor was without the least shred of authority or right to release or modify the covenant, so far as it operated to confer a benefit on land which he had previously conveyed. One person is without the least power or capacity, in the absence of a delegation of power, to release or change the rights of another in land. For a principle so elementary no authority need be cited, yet it appears that Lord Romilly, as master of the rolls, passed upon this very question in *Western* v. *MacDermott, L. R., 1 Eq. Cas. 499, 506.*

It is more difficult to describe the other ground. The deed to the complainant, it will be remembered, states that the four acres conveyed by it consist of a portion of lot No. 16, shown on a map of Montrose, dated January 1st, 1867, and filed in the register's office. No map of that date was ever filed. No map was filed until November, 1869, and the one then filed, the proofs show, was made in the spring of 1868. The complainant says that his purchase was made under the map of 1867, and that his grantor, between the date of the conveyance to him in May, 1867, and the conveyance to Mr. Schoch in June, 1868, caused a new map of Montrose to be made, by which the land composing that estate was entirely changed in its arrangement and division from the arrangement and division originally made and appearing on the map of 1867. These changes consisted in laying out new roads, where none appeared on the map of 1867,

and also in subdividing the tracts laid down on the map of 1867, and thus reducing their size. The complainant further says, that in consequence of these changes, and subsequent conveyances made in conformity to them, the character of the whole neighborhood has been completely changed, and that now, after a lapse of more than twenty years, instead of Montrose being divided into tracts or plots suitable for gentlemen's country residences, it is divided into small lots, upon many of which dwellings have been erected, which are occupied, and that now, instead of the land being an open country, with here and there a large and handsome dwelling, surrounded by beautiful grounds, as it was laid out on the map of 1867, it has become a populous village. These alterations in the arrangement and division of the land composing the estate of Montrose, and the changes which, in consequence, have taken place, both in the manner in which the land is used and in the character of its occupants, have, the complainant claims, absolved him from all duty to keep his covenant, and that he is, consequently, entitled to a judicial declaration that it is without force.

The argument by which it is attempted to maintain this claim is this: that the complainant's grantor, by referring to the map of 1867 in the deed by which the four acres were conveyed, made the map a part of the deed, and that when the deed and map are read together, it must be seen that one of the promises, made by implication to the complainant when he purchased, was that the arrangement and division of the land composing the estate of Montrose, delineated on the map of 1867, should be maintained forever for the common benefit of the owners of the land. From this condition of affairs, it is contended, that it results, as a matter of law, that the complainant's grantor became subject to an implied covenant to maintain inviolate the arrangement and division then existing, which, if broken, would extinguish the complainant's covenant. It cannot be disputed, that where the owner of a tract of land cuts it up or divides it in such manner as to give one part an additional value because of rights which, under the division, are given to it in the other part, and then causes a map or plan of his division, showing

such rights, to be made, and afterward makes sale by the map or plan of the part increased in value by rights given to it in the other part, and the part sold is subsequently conveyed by a deed which describes the land by reference to the map or plan, that such rights will pass to the grantee, although no express grant of them is made. The law on this subject is settled. The latest exposition of it will be found in *Lening* v. *Ocean City Association, 14 Stew. Eq. 606.* The rights in the other land are held, in such cases, to pass by implied covenant or grant; that is, the court, upon a full and careful consideration of all the facts leading up to the transfer of the title, which it may lawfully consider, and after reading the instrument by which the title is transferred, with the aid of the map or plan, finds that it was the intention of the grantor to grant a particular right, not embraced within the words of the grant, and that the grantee had a right to understand that such right would pass to him by the grant. The whole doctrine of implied covenants and grants rests on the presumed intention of the parties. It can have no other rational foundation. This being so, it seems to me to be clear that the complainant's case is without foundation.

His claim is, that the court, on looking at his deed and the map to which it refers, must see that it was the mutual understanding of his grantor and himself, at the time the four acres were conveyed to him, that the arrangement and division of the land in question, appearing on the map of 1867, should be maintained forever. On the facts now before the court, I do not think it is possible to see anything of the kind. It is true that the complainant's deed refers to the map of 1867, but there is not a word of proof in the case from which it can be inferred that the complainant made his purchase by that map, or that it was exhibited to him at any time prior to the delivery of his deed, or when his deed was delivered. The complainant was not examined as a witness, and there is nothing before the court, as evidence, which would support even a suspicion that the complainant, in acquiring the title to the four acres, was in the slightest degree controlled or influenced by the map. But more: the complainant's deed furnishes conclusive evidence that he

knew, when he accepted it, that the arrangement and division of the land, shown on the map of 1867, would not be maintained or preserved.  Lot No. 16, shown on that map, contained seven and eighty hundredths acres.  He accepted a conveyance of four of the seven acres by a deed describing the four as part of a larger tract as laid down on the map.  So that it would seem to be well nigh undeniable that the reference to the map of 1867, made in the deed to the complainant, instead of indicating an intention on the part of his grantor to abide by the scheme of division laid down on that map, evinced, on the contrary, a purpose to depart so radically from it as to give the complainant plain notice that he would not, in his future conveyance, pay the slightest regard to it.  The complainant certainly had no right to understand or believe that his grantor would, in his future conveyance, abide by a plan of division which he had utterly disregarded in his conveyance to him.  To raise a covenant by implication, under such circumstances, it would be necessary to make an implication, not in accordance with what the fact probably was, but in defiance of what the fact was known to be.  The foundation, therefore, on which it has been attempted to place the complainant's case does not exist.

But, had the opposite conclusion on this point been reached, I would still be of opinion that no case had been shown which entitled the complainant to the decree he asks.  The proposition on which he rests his right to relief is, that where two persons become bound to each other by different covenants, made at the same time, that a breach by one party of his covenant extinguishes the covenant of the other.  I know of no such rule of law.  The complainant, it is important to remember, is not before the court resisting an attempt by the defendant to compel him to abide by the strict letter of his covenant.  In such a posture of affairs, it would undoubtedly be the right of the court, as well as its duty, to look at the conduct of the parties to the litigation, and also at the conduct of their predecessors in right and duty, to see how they had dealt with each other in respect to the covenant, and also to contrast the condition of the property when the litigation arose with its condition when the covenant was

made, and then either decree or deny specific performance, as should appear to be most in accordance with justice and right, under all the circumstances of the case. This is the utmost length to which the decisions in *Duke of Bedford* v. *British Museum, 2 Myl. & K. 552*, and in *Columbia College* v. *Thacher, 87 N. Y. 311*—the cases mainly relied on by the complainant—will permit the court to go. Neither of these cases, nor any other that has come under my notice, goes to the extreme length of holding that, because reasons exist which might induce a court of equity to decline to specifically enforce a covenant, the covenant should, for that reason, and in advance of a breach, be declared to be a nullity in a suit instituted by the covenantor.

Under the form of action adopted in this case, the defendant is entitled to a decree, adjudging that the complainant's covenant is valid, and that the defendant, as the owner of land lying adjacent to that owned by the complainant, is entitled to the benefit of the complainant's covenant. The question whether, if the complainant should hereafter commit a breach of his covenant, the defendant would be entitled to a decree for specific performance, in view of the facts now before the court, has not, of course, received the slightest consideration. The defendant is entitled to costs.