These two suits have a common object, viz.: The enforcement of certain restrictive covenants affecting lands at Deal Beach, New Jersey, owned by the defendant DeLisle when the first bill was filed, but conveyed by him during the pendency of that suit to one Randall, who conveyed to the defendant L. Hitch Harrison on May 1st, 1925.
The original suit was pending before the late Vice-Chancellor Foster at the time of his death. The taking of testimony in that case was completed, but the case had not been argued. It was referred to me on May 22d 1925, and oral argument on behalf of complainant was heard on June 13th, 1925. The solicitors of the defendant DeLisle did not appear at the argument. The solicitor of the defendants in the second suit appeared, but made no argument at that time. The bill in the second suit was filed on the 12th day of June, 1925. Thereafter, on June 16th, 1925, upon his application, L. Hitch Harrison, one of the defendants in the second suit, was admitted as a party defendant in the first suit, and, subsequently, by order of this court, the two suits were consolidated. It was stipulated by the respective solicitors that the testimony and proofs taken and submitted in both cases should be considered by the court in the consolidated case.
The complainants are residents of the borough of Deal, and are the owners of certain lots shown on a map of property of the Atlantic Coast Realty Company in that borough, and they, or their predecessors in title, acquired title thereto from the Atlantic Coast Realty Company, as shown by the following tabulation: *Page 258 
 Date of Deed
 from Atlantic
 Coast Realty Date of
Complainant Block Lot Co. Recording
Polhemus .... 25 15, 16, 17 .......... Sept 25, 1911 Sept. 28, 1911
Jones ....... 41 7, 8 ................ Dec. 1, 1897 Aug. 7, 1899
 " ....... 41 10, 12 .............. Aug. 17, 1903 Aug. 19, 1903
 " ....... 41 3, 5, 6 ............. Oct. 12, 1899 Oct. 18, 1899
 " ....... 41 20 .................. Jan. 25, 1904 Feb. 6, 1904
Gregory ..... 25 20 and part of 21 ... Oct. 9, 1911 Oct. 9, 1911
Cook ........ 13 251, 252, 253, 254 ..
McDonald ... 1 4, 5, 6, 7 .......... Oct. 1, 1897 Oct. 7, 1897
 " ... 19 15 .................. Jan. 25, 1904 Feb. 2, 1904
 " ... 27 6, 8, 11 and part of
 19 ................ Nov. 4, 1897 Nov. 8, 1897
 " ... 27 13 .................. Aug. 17, 1903 Aug. 21, 1903
Sugden ...... 5 146 ................. No proof

The deed from said company to the predecessors in title of the present owners of block 26, on which is located Deal Inn and cottages (to be hereinafter referred to), was dated July 1st, 1907, and recorded July 3d 1907.
The defendant William S. DeLisle, at the time of the filing of the first bill, was the owner of lots 2, 4, 6, 18, 19, 20, 21, 22 and 23 in block 28 on said plan. These same lots, at the time the second bill was filed, were owned by the defendant L. Hitch Harrison, and are still owned by him. These lots, with the exception of lots 2, 4 and 6, were conveyed by the Atlantic Coast Realty Company to the predecessor in title of this defendant by deed dated January 25th, 1904. Lots 2, 4 and 6 were conveyed by the Atlantic Coast Realty Company by deed dated April 23d 1910.
After the defendant Harrison purchased these lots he leased them, with the buildings located thereon, to the defendant Club Braxton, Inc., a corporation of New Jersey, organized under the act for the incorporation of associations not for pecuniary profit. P.L. 1898 p. 422. This corporation, according to the testimony, has no financial resources whatever. Its financial backing is furnished by the defendant Casper Hagemeyer, who is also the principal stockholder and virtual owner of Braxton Club, Inc., a Delaware corporation organized under the General Corporation act of that state, *Page 259 
and claimed to be a separate and distinct entity from Club Braxton, Inc. The defendant Hagemeyer is undoubtedly a sort of "three in one" personage. He is the Club Braxton, Inc., Braxton Club, Inc., and his own proper person. While it is claimed that these three are separate and distinct, it is plain to my mind that the New Jersey corporation is a mere shell or subterfuge for the Delaware corporation, and that that corporation is a mere shell or shield for the defendant Hagemeyer. The testimony, which it is unnecessary to detail, plainly shows this. I shall, therefore, consider these three as one, and shall refer to them as "Braxton."
The evidence shows to my satisfaction that in August, 1897, the Atlantic Coast Realty Company purchased a large tract of land in the borough of Deal, comprising all the southerly part of what is now the borough of Deal, from the Deal Beach Land Company, and laid it out in streets, blocks and lots according to a general plan or scheme of improvement, and uniformly thereafter, when conveying lots or plots from said tract, imposed thereon in the deeds of conveyance the following restrictive covenants recited as "covenants running with the land," to wit:
"And the said party of the second part, for himself, his heirs and assigns, does hereby, and by his acceptance of these presents, covenant, promise and agree to and with the said party of the first part, its successors and assigns, that the said party of the second part, his heirs and assigns, shall not, nor will, at any time hereafter, erect, keep or carry on, or cause or procure, permit or suffer to be erected, kept or carried on upon the herein granted and described premises or upon any part thereof, by himself, or themselves, or by any other person or persons holding possession under him or his title, any brewery, distillery, slaughter-house, fish stall, smithshop, forge, furnace, steam engine, brass foundry, boiler factory, nail or other iron foundry, bakery, sugar refinery, cow stables, livery stables, hog pens, menagerie, laundry, gas works, or any soap, candle, oil, starch, varnish, vitriol, glue, ink, turpentine or lamp black factory, or establishment for the tanning, dressing or preparing skins, hides or leather, or any trade, manufacture, saloon, store or shop whatsoever; nor at any time or times hereafter, erect, or cause or procure, permit or suffer to be erected upon the said land, a dwlling-house which shall be of less value at the time of its erection than four thousand dollars; nor erect, or cause or procure, permit or suffer to be erected *Page 260 
upon the said land any buildings, piazza, porch, bay-window or other obstruction to view within fifty (50) feet of the northerly line of the said Monmouth drive (except only an ordinary open veranda or piazza, or steps leading from the first floor of a porch, piazza, veranda or house to the ground), nor any barn, stable or other outhouse within one hundred feet of said Monmouth drive; nor shall any building, structure or erection of any kind whatsoever be erected upon said land unless plans and specifications therefor be first submitted to the said party of the first part for its approval, and the same be approved by the said part of the first part, or by its agent for the purpose duly authorized; nor at any time or times hereafter cause or procure, permit or suffer any intoxicating or malt liquors to be sold upon the herein-granted premises or upon any part thereof. And it is understood and agreed that this covenant is attached to, and shall be construed to be, a covenant running with the land; and that it shall be lawful for the said Atlantic Coast Realty Company, its successors and assigns, to institute and prosecure any proceedings at law or in equity against the person or persons violating or threatening to violate the same; it being further understood, however, that this covenant is not to be enforced personally for damages against the said party of the second part, his heirs or assigns, unless he or they be the owner or owners of that portion of the said premises upon which a violation of the covenant is threatened or done, but the said covenant may be proceeded on for an injunction of and for a specific execution thereof against the said party of the second part, his heirs or assigns, and for damages against the party or parties violating the said covenant, his or their heirs, executors, administrators or assigns."
All of the deeds of conveyance from the Atlantic Coast Realty Company for the lots owned by the complainants and defendants contained the same restrictions.
It is contended by the complainants, and proved to my satisfaction, that the defendant Braxton is conducting, upon the lots owned by the defendant Harrison, a restaurant, hotel and road house. Food, drinks (including malt liquors) and cigars are sold there to whomsoever will buy, although it is claimed by the defense that club members only are catered to and accommodated. It is further contended that the conduct of this road house and restaurant, and the sale of food, drinks, cigars, c., therein is in violation of that part of the restrictive covenant prohibiting "any trade, manufacture, saloon, store or shop whatsoever" on any of the lots conveyed to the defendant Harrison. The defendants urge six defenses against the prayer of the bill of complaint as follows: *Page 261 
1. That the defendants are not operating a public restaurant or road house, but are conducting a private club, which is not prohibited by the covenants.
2. That the restrictions in the deeds of Atlantic Coast Realty Company do not prohibit the carrying on of any kind of business, but only certain trades, of which defendants' business is not one.
3. That the restrictions as to the carrying on of trades and businesses have been abandoned and are not enforced.
4. That the complainant acquiesced in and allowed material violations of the covenants, and thereby waived the same.
5. That the character of the neighborhood has changed since the imposition of the restrictions, and that it would, therefore, be inequitable to enforce them.
6. Laches. Failure to make prompt application for relief, and permitting defendant to expend large sums of money after notice of the purpose for which defendants proposed to use the property.
Restrictive covenants very similar to those above recited were before this court for construction and enforcement in the case ofMorrow v. Hasselman, 69 N.J. Eq. 612, where a bill was filed to restrain an encroachment upon a building line as established by those covenants. The restrictions were upheld and enforced.
The restrictive covenants here in issue have also been before this court for construction and enforcement on at least two occasions. The first case was an unreported case, Peer v.Deal, which will be found in docket 35, page 215, in the office of the clerk in chancery, in which Vice-Chancellor Howell advised an injunction restraining the operation of a barber shop in the Municipal Hall Building. The other case was that of Jane E. Cooket al. v. David Newburger, another unreported case, in which the late Vice-Chancellor Foster advised a decree restraining the defendants from erecting a dwelling at a cost less than that prescribed by the restrictions.
In Morrow v. Hasselman, supra, Vice-Chancellor Emery found that the restrictions were imposed in pursuance of a *Page 262 
general plan of improvement by a uniform scheme and for the benefit of all the lots in the tract and of each purchaser. It is alleged in both bills of complaint that the tract of land purchased by the Atlantic Coast Realty Company in 1897 was "laidout into plots and lots for an exclusive residential seasidesummer resort, and for the purpose of protecting said tractagainst nuisances and trade, and reserving it for an exclusiveresidential resort," imposed the above-recited restrictions on all the lots in said tract. This allegation is specifically admitted in the answer filed in the first suit, and is not denied in the answer filed in the second suit.
The law in this state respecting the enforcement of restrictive covenants imposed upon lands in pursuance of a general scheme, as here, is so well settled that it seems idle to restate it. The following cases, however, may be said to state the law and record its development; Coudert v. Sayre, 46 N.J. Eq. 396; Lennig v.Ocean City, 41 N.J. Eq. 606; De Gray v. Monmouth Beach ClubHouse, 50 N.J. Eq. 329; Hayes v. Waverly and Passaic RailroadCo., 51 N.J. Eq. 345; Trout v. Lucas, 54 N.J. Eq. 361; Morrow
v. Hasselman, 69 N.J. Eq. 612; Barton v. Slifer, 72 N.J. Eq. 812; Leaver v. Gorman, 73 N.J. Eq. 129; Newbery v. Barkalow,75 N.J. Eq. 128; Bowen v. Smith, 76 N.J. Eq. 456; Sanford v.Keer, 80 N.J. Eq. 240; Winslow v. Newcomb, 87 N.J. Eq. 480;Dettsloff v. Hockstetter, 96 N.J. Eq. 391; Laverack v. Allen,2 N.J. Mis. R. 637.
It is not denied that all of the defendants had either actual or constructive notice of the covenants in question.
Since the opening of this tract of land for development, millions of dollars have been expended in the construction of private homes and residences thereon, and in the embellishment of the grounds surrounding them, until Deal Beach, of which borough this tract composes the major part, is one of the most attractive seashore resorts along the whole Atlantic coast, and is one of the show places of the state. Undoubtedly, the greater part of the investments in private homes on this tract has been induced by the very restrictive covenants here in issue, and in reliance upon their assurance *Page 263 
of a residential community free from the annoyances of trade and business.
I will consider the various defenses interposed by the defendants in their order.
1. I have no hesitancy in finding as a fact that the defendants are operating a public restaurant and road house where food, drinks and other commodities are sold, and where guests are entertained and supplied with rooms for sleeping purposes. While it is claimed by the defendants that the operation is that of a club, if so, it is a very unusual one. Almost anyone can join the club without the payment of dues and on the mere recommendation of some member or acquaintance of the defendant Hagemeyer. It appears from the testimony that practically the whole populace of the north New Jersey shore has been asked to join the club, and persons who are not members of the club have been entertained and served in the restaurant the same as those who claim to be members. The place is operated much on the same plan as any high-class public restaurant, one of the indicia of which is the hat and coat checking outfit, the concession for which, according to the testimony, was here sold for $1,000 per annum. According to the testimony, Club Braxton has no financial responsibility whatever. Braxton Club is a Delaware stock corporation licensed to do business in New Jersey. That company's business is to cater to the members of Club Braxton. The members of Club Braxton who patronize the club and their friends pay no dues to Club Braxton, but pay charges to the Braxton Club, the Delaware corporation. All the money that is paid for service on the premises is paid to the Braxton Club of Delaware, and that company runs the business for profit. It charges the members of Club Braxton and others not only for food, but imposes a cover charge as well, and charges for the rooms occupied by those who remain over night. The club itself (that is, the New Jersey club) neither receives nor pays out any money; nor does it incur any expenses or have any financial obligations or resources. Whatever business is done there is conducted by the Delaware corporation. The defendant Hagemeyer, on his own *Page 264 
testimony, is the Club Braxton and the Braxton Club, and he owns all the stock in the Delaware corporation and runs the whole business. It is quite plain, therefore, that the business of operating a public restaurant and road house is being conducted on the defendants' premises, and the organization of these clubs is a mere subterfuge in an attempt to evade the restrictive covenants.
2. The question to be decided under this heading is whether or not the words "any trade, manufacture, saloon, store or shop whatever," as contained in the restrictive covenants, are inclusive of a public restaurant, road house or business such as is being carried on by the defendants. In defining the word "trade," Judge Storey, in "The Nymph" Case (U.S.), 18 Fed.Cas. 506, said: "The word is often, and, indeed, generally used as equivalent to occupation, employment or business, whether manual or mercantile. Whenever any occupation, employment or business is carried on for the purpose of profit or gain or livelihood, not in the liberal arts or learned professions, it is constantly called a trade."
"Trade" is defined by Webster as the "act or business which a person has learned, and which he carries on for procuring subsistence or profit."
The word "trade," in its broadest significance, includes not only the business of exchange of commodities by barter, but the business of buying and selling for money, or commerce and traffic generally. U.S. Hotel Co. v. Niles, 134 Fed. Rep. 225, 226;
see, also, Geise v. Pennsylvania Fire Insurance Co.,107 S.W. Rep. 555, and 8 Words Phr. (1st ser.) 7037, and 4 Words Phr. (2d ser.) 955, and cases therein cited; also, 38Cyc. 670.
In construing statutes and determining the meaning of ambiguous words or obscure language contained therein, inquiry is always made as to the intention of the legislature in adopting the act, and the object of the statute and the evil to be remedied are always considered; so, here, it is of the utmost importance in determining the meaning of the words of this covenant, to consider the intention of the original promoters of this tract of land and the object sought *Page 265 
to be attained by the imposition of these restrictions. It is admitted by the defendant in the original suit that the object of the restrictions was "for the purpose of protecting said tract against nuisances and trade, and reserving it for an exclusiveresidential resort;" and that this was the main object of the covenants seems too plain for argument. The word "trade" ought, therefore, to be so interpreted as to accomplish the end sought. To give it the narrow construction claimed for it by the defendants would, in my judgment, be to ignore entirely the plain intention of the framers of these restrictions. If it was their intention to reserve this entire tract for "an exclusive residential resort," then the purpose of the covenant must have been to carry out that intention. The word "trade" ought, therefore, to be applied in its broadest sense, so as to include in its meaning the very things which it was intended should be excluded from this tract. To say that the word "trade" does not contemplate a public restaurant would be, in effect, to say that a public restaurant could be established on every corner throughout the tract, or, indeed, on each lot. If public restaurants were so numerously established, could it be said that this was still "an exclusive residential resort?" I think not.
I am therefore of the opinion that the business of a public restaurant and road house is included within the word "trade," and is prohibited by this covenant. But the language of the covenant is broader than that. It also prohibits "any saloon, store or shop whatsoever." A restaurant is often termed an "eating saloon," and a store is a place where goods are sold; and while a restaurant and a store are not synonomous, the selling of cigars and drinks might be considered as a part of the business conducted at stores generally, and I have no doubt, from the language of the covenant, embracing, as it does by its terms, almost everything of an offensive nature, and indicating, as it does, to my mind, that it was the intention of the promoters of this tract to prohibit business of every kind thereon; that the covenant was intended to apply to trade or business of the *Page 266 
kind being conducted by the defendant. The admission of this class of business or trade into this residential community would be but an entering wedge, to be followed by businesses of a more objectionable nature hereafter. It is but a step from the high-class restaurant to the ordinary lunch room, the "hot dog" stand, and to the corner grocery, the hurdy-gurdy and what not. In my judgment, it was never the intention of the original promoters of this tract, who drew these elaborate restrictive covenants, that this or any other kind of business should be permitted to be conducted within the limits of the tract developed by them.
3, 4 and 5. These defenses may be considered together.
The violations of the covenant alleged by the defendants to indicate the abandonment of the restrictions, acquiescence therein by the complainants and a change in the character of the neighborhood are as follows:
(a) The Hathaway Inn.
(b) Deal Inn.
(c) Loughman Loughman real estate office.
(d) The Trevisan.
(e) The O'Sullivan livery stable.
(f) Carroll's boarding-house.
(g) Gwinn's boarding-house.
(h) O'Shea's apartment-house.
(i) The erection of seven houses on Lakeview road and Monmouth drive in violation of the restrictions as to building lines.
(a) As to the Hathaway Inn, it may be said that this has no bearing whatever on the case. The Hathaway Inn has been in existence as an inn and tavern for over one hundred years and is one of the landmarks of that section of the state. It was not a part of the original tract of land laid out by the Atlantic Coast Realty Company.
(b) The Deal Inn was originally built by the Atlantic Coast Realty Company as a club house for the Deal Country Club, and it is surrounded by a number of cottages which were built and used as residences by some of the original directors of Atlantic Coast Realty Company. The inn and *Page 267 
cottages occupy one whole block of ground, and are known as "Deal Inn and Cottages." The inn itself was for a time occupied as a private residence, and the testimony shows that in 1904 or 1905 a restaurant was conducted there in connection with the country club. This property was later leased by the Atlantic Coast Realty Company and conducted as an inn and tavern, and in 1907 that company sold the property while it was still being conducted as an inn and tavern, and inserted in the deed of conveyance to the purchaser the same restrictions as are contained in the deeds of complainants and defendants. It has been conducted as an inn and tavern continuously from that time down to the present time. It is contended that the acquiescence of complainants in the establishment and operation of Deal Inn for so long a time constitutes a waiver and an abandonment of the restrictions by the complainants, and that they are thereby barred from objecting to the establishment of another inn or public restaurant on the tract. It is also urged that the fact that the Atlantic Coast Realty Company permitted Deal Inn to be conducted as an inn and tavern, and later sold that property and included in the deed of conveyance therefor the same restrictions as are here under review, is a practical interpretation of the covenants adversely to the claims of the complainant; and, in effect, a statement that the language of the covenants was not intended to apply to a business of that character. In answer to these contentions it may be said that some of the complainants or their predecessors in title acquired their lots from the Atlantic Coast Realty Company subsequent to the establishment of Deal Inn as a public hostelry by the realty company, but prior to its conveyance to that company in 1907, and having bought with knowledge of the existence of that inn, they were not in a position to object to its continuance; but these complainant purchasers had a right to rely upon the restrictions protecting them from the establishment of any further business places of this or any other sort. It may well have been the intention of Atlantic Coast Realty Company to prevent the opening of another inn by the imposition *Page 268 
of these restrictions, and thus protect its own business interests with respect to Deal Inn; or, it may have been their intention in conveying the property in 1907 subject to the same restrictions to thereby attempt to interpret the restrictions as not applying to that class of business. Some of the complainants here, however, or their predecessors in title, acquired title to their lots as early as 1897, before the Deal Inn was built and operated as a club, and still others bought before the property was sold in 1907. After such sales by the defendant company to these complainants, that company could not, by its interpretation of the covenant, bind its prior grantees. In Coudert v. Sayre,supra, it was held that the common grantor of lots subject to restrictive covenants "was without the least shred of authority or right to release or modify the covenant so far as it operated to confer a benefit on lands which he had previously conveyed." In that case there was a written release of the covenants executed by the common grantor, and the court held it ineffective. Much less could the common grantor here, by his own interpretation, modify the plain meaning of the restrictive covenant contained in complainants' and defendants' deeds, and imposed upon all of the lots in this tract, and thereby bind its prior grantees. Newbery v. Barkalow, supra; Bowen v. Smith,supra; Dottsloff v. Hockstetter, supra.
The testimony shows that at the time Deal Inn was first operated there were but three or four residences on the whole tract. The existence of Deal Inn, in my judgment, in no way evidences an acquiescence by the complainants in the use of the lots on this tract generally for business purposes nor for this particular class of trade or business. They may be bound as to the particular lots upon which Deal Inn is located, and as to that inn, although that question is not now before this court, but they are not obliged to submit to an extension of this class of trade or business on other lots. Leaver v. Gorman, supra.
In that case it was held that the complainant, because of his acquiescence for several years in the establishment of a bottling plant on a restricted lot, had lost his right to object *Page 269 
thereto, but it was held that, timely objection having been made, he was not obliged to submit to an extension of that plant to an adjoining lot. It appears from the exhibits in this cause that the defendant Harrison is now the owner of both the Deal Inn property and the Club Braxton lots. This is, for all practical purposes, the same situation as confronted the court in Leaver
v. Gorman, except that there the lots on which the old bottling plant was located and those on which it was proposed to extend that plant were adjoining, but this, to my mind, is immaterial — the same principle is involved here. Applying the rule of that case, I hold that complainants' acquiescence in the existence and operation of Deal Inn is no bar to the relief prayed for in this suit.
(c) As to the Loughman real estate office, the testimony shows that Loughman Loughman are engaged in the real estate business in Newark, New Jersey. One of the partners resides at Deal, New Jersey, and uses his residence as a branch office. The Loughman residence, however, is not located on a street on which any of the complainants own property, and at least some of the complainants never heard of the real estate office being located there until one of the hearings in this cause. There is no waiver here, at least, as to those complainants who had no knowledge of the existence of this office, and the fact of its existence does not, to my mind, indicate an abandonment of the covenant.
(d, e, f, g, h, i) The Hotel Trevisan is located several blocks away from most of the complainants, and some of the complainants had no knowledge of the existence of this house until one of the hearings in this cause. The same may be said of O'Sullivan's livery stable, the Carroll and Gwinn boarding-houses and O'Shea's apartment-house; and as to the violation of the restrictions with respect to the building lines on Lakeview road and Monmouth drive, these violations can in no way affect the complainants here, because none of the complainants reside on either of those streets, and these violations, if they exist, would come within the rule of this court in Morrow v. Hasselman. All of the violations under this head, and referred to by the defendant, are located on *Page 270 
parts of the tract considerably distant from the residences of the complainants, and, in this connection, the language of Vice-Chancellor Leaming, in Barton v. Slifer, supra, is pertinent. In that case there were some twenty violations of the restrictive covenants, some of which were within one block of property owned by the complainants, and one violation on the opposite side of the street on which the complainant resided. Vice-Chancellor Leaming said: "It will be observed that there have been no violations of the covenant which have in any substantial way affected the property of complainants, and but two possible violations upon the streets on which complainants' lot is situated, and that but six violations of the covenant are alleged within a district in which three hundred and eighty buildings are erected. * * * Even though it should be conceded that the twelve violations of the covenant which have been permitted in what has been defined as the business district northeasterly of Ninth street has amounted to an abandonment, in that district, of the original scheme designed to be preserved by the covenant, it does not follow from that fact that the right to the enforcement of the covenant for the preservation of the original scheme in a separate district where essentially different conditions prevail has been lost. Changing conditions, such as the growth of business interests, may well modify the needs of one portion of a city to such an extent as to induce the abandonment of the general plan as to that portion without any intentional abandonment of the plan as to territory where other and radically different conditions prevail. In this view I am unable to regard the breaches of the covenant in the territory northeasterly of Ninth street as evidence of an intention to abandon the preservation of the general plan in the residential portion of the city referred to.
"As to the territory southwesterly of Ninth street, which has been defined as the residential district, I entertain the view that the six violations of the covenant pointed out by defendant cannot be considered as sufficient evidence to indicate the abandonment of the original plan in the district where nearly four hundred buildings have been erected in *Page 271 
conformity to the plan. The extremely small percentage of the breaches of the covenant which defendant has pointed out rather tends to the establishment of the fact that it has been the defined purpose of the property holders in that district to adhere to the preservation of the original plan sought to be preserved by the covenant."
With slight modifications to conform to the facts of the casesub judice, that language is quite applicable here. The borough of Deal is largely built up; very few, if any, vacant lots remaining on the Atlantic Coast Realty Company tract. It seems idle to contend that the very few violations of the restrictive covenants imposed by the realty company which the diligence of counsel for defendants has been able to produce indicates an abandonment of any of the provisions of the restrictive covenants; rather is this small number of violations an indication of the general adherence to the original plan; and, indeed, this idea is amply supported by the testimony of the defendants' own witness. At least three of the defendants' witnesses, Berringer, Tinker and Milan Ross, the three witnesses on the part of the defense who, perhaps, were best qualified to testify on this point, all declared unequivocally that the general scheme of the restrictive covenants has been rigidly adhered to; that property in Deal has been generally bought and sold under these restrictions; that the restrictions are uniformly considered to be binding and to be observed, and that there has been no general waiver or abandonment of these restrictions by the residents and property owners at Deal. Practically all parties admit that there have been a few minor infractions, but, as a general rule, the restrictions have been observed by everyone, and any infraction which has come to the notice of those interested in their observance has been promptly protested against. My conclusion on this point is therefore that there has been no abandonment or acquiescence by the complainants which would bar them from insisting upon the enforcement of this restrictive covenant; that the character of the neighborhood has not changed, and that it would not be inequitable to enforce these covenants against the defendants. *Page 272 
It is contended by counsel for the defendants that the rule ofMorrow v. Hasselman, supra; Barton v. Slifer, supra;Newbery v. Barkalow, supra; Bowen v. Smith, supra, and other similar cases applies only to restrictive covenants relating to the location of buildings and not to covenants regarding the use to which the property may be put, and they claim that Morrow v.Hasselman supports this argument. I do not accede to this proposition. The same principal is involved in both classes of covenants. The only difference is that it is more a question of waiver in the first class and of general abandonment in the latter class. Morrow v. Hasselman did not decide that a single violation of a covenant restrictive of the use of the land would invalidate, release or cancel that covenant as to all other lots in a tract for the benefit of which the covenant was imposed. Vice-Chancellor Emery, in that case, merely pointed out that certain cases therein cited applied to covenants restrictive of the use of the land. The point which counsel for defendant makes was not there involved. The decision in that case, as I understand it, was confined solely to the point that immaterial and isolated violations of building restrictions, not seriously affecting the complainant, were not a bar to his seeking relief from a violation of such restrictions which would injuriously affect him.
It is also suggested by counsel for defendant that Trout v.Lucas is authority for the contention that by establishing Deal Inn or permitting its operation, the Atlantic Coast Realty Company, the common grantor here, has waived the restrictions against trade as applied to businesses of the character of Deal Inn; that this company has, by this operation, deprived its grantees of the benefit of this covenant, and that, therefore, the complainant-grantees are without the right to protest against Braxton. I do not understand Trout v. Lucas to stand for any such proposition. It does hold that grantees of the common grantor who take their conveyances subsequent to a waiver by the common grantor are bound by that waiver, but if the contention of counsel for the defense is correct, then the decision in Trout
v. Lucas must be opposed to *Page 273 Coudert v. Sayre, and the later cases of Bowen v. Smith,Barton v. Slifer and Dottsloff v. Hochstetter (the last case having been decided by the court of errors and appeals); but such is not my understanding of the decision of this court inTrout v. Lucas. I do not consider that case as opposed toCoudert v. Sayre and the other cases cited. I understandTrout v. Lucas to go no further than to hold that the grantees of the common grantor, who take title subsequent to a waiver by that common grantor, are bound by such waiver; but here it will be noted that some complainants, notably the complainants Jones and McDonald, acquired title from the Atlantic Coast Realty Company in 1897, prior to the time when Deal Inn was built, so that they, at least, are in a position to object to any violation of the covenant by these defendants. Their rights are property rights, which this court will protect, notwithstanding there may be other complainants to this suit who do not occupy such a favorable position.
6. There was no appreciable delay in the filing of the bills in these cases. The defendant DeLisle acquired title on August 29th, but the deed was not recorded until September 8th. This property was formerly a handsome private residence, but had become vacant and was in a very bad state of repair. Anyone purchasing the property and occupying it would have been obliged to make extensive repairs. The defendant took possession of the property immediately after his purchase, and began repairing it. He testified that he spent over $5,000 in repairs and in fitting it up for his business. Twelve hundred dollars of this, however, was spent on repairs to the roof, and he was unable to give any detailed statement of how the $5,000 was spent. It may be safely assumed that it was necessary to spend a large part of this money for repairs regardless of the use to which the property was to be put, if it was to be occupied at all. There is no testimony which satisfied me that any proper notice of his intention to operate a restaurant on these premises was given to the complainants or to the public. The only positive, believable testimony as to public notice was concerning *Page 274 
a notice which appeared in the paper one day before the place was opened as a public restaurant on October 6th, 1923. None of the complainants knew anything about the proposed restaurant until, at most, a few days before it was opened. Immediately after that counsel was employed and the bill of complaint was filed on October 19th. Certainly, no greater promptness could be required. The bill in the second suit was filed on June 12th, 1925, within two weeks of the announcement of the change of ownership, but the defendants in the second suit had full and complete notice of the pendency of the original suit, and no laches can be charged against the complainants in the second case.
On the whole, I am of the opinion that the complainants are entitled to the relief prayed for, and I will advise a decree in their favor in accordance with these conclusions.